# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, )<br>)<br>Appellant, )<br>)<br>v. )<br>)<br>JOSHUA JOSEPH SOLOMON, )<br>)<br>Respondent. )<br>)<br>_____ ) | DIVISION ONE<br><br>No. 76298-2-I<br><br>PUBLISHED OPINION<br><br><br>FILED: May 29, 2018 |

DWYER, J. — A trial court may dismiss the charges against a defendant when the State is found to have engaged in outrageous misconduct in violation of a defendant's due process right to fundamental fairness. We review such a determination by the trial court for abuse of discretion.

In this matter, a law enforcement officer anonymously published an advertisement on an online classifieds platform reserved for those over the age of 18 and indicated that she was "a young female" seeking an individual interested in a casual sexual encounter. Joshua Solomon responded to the advertisement. Thereafter, the police officer assumed the guise of a fictional 14-year-old girl and sent Solomon nearly 100 messages laden with graphic, sexualized language and innuendo and persistently solicited him to engage in a sexual encounter with the fictional minor, notwithstanding that he had rejected her solicitations seven times over the course of four days.

The trial court herein found that, in the totality, the actions of the law enforcement officer constituted outrageous misconduct in violation of Solomon's right to due process and dismissed the charges against him.

The trial court did not abuse its discretion by so ruling.

Accordingly, we affirm.

I

On September 10, 2014, Detective Theresa Luvera of the Skagit County Sheriff's Office anonymously published an advertisement on Craigslist, an online classifieds platform, in a section of the website in which individuals 18 years of age or older could solicit casual sexual encounters.[1] The detective's advertisement was part of an undercover law enforcement operation designed to locate and prosecute individuals desiring to engage in unlawful sexual conduct with minors.

The detective's advertisement set forth that the individual seeking a casual sexual encounter was "a young female looking for sex with either a man or woman." It did not set forth the individual's name or age.

On September 12, 29-year-old Solomon responded to the advertisement, inquiring whether the individual who posted the advertisement was "Only interested in woman."[2] Nearly four hours later, Solomon added, "Must be I won't bug anymore."

---

[1] In order to publish or respond to such an advertisement, the website's terms and conditions required that a participating individual acknowledge that they are eighteen years of age or older.

[2] We reference the parties' electronic communications using the original punctuation, syntax, and spelling.

Four days later, Detective Luvera replied to Solomon's message. She identified herself as Taylor. Under the guise of Taylor, Detective Luvera indicated that she was still interested in having a sexual encounter. Solomon responded and they began to exchange messages. They also exchanged photographs.[3]

Forty-five minutes after Detective Luvera initially responded to Solomon's inquiry, she sent him a message discussing her age for the first time. She indicated that she was "almost 15 but waaay advanced." Her message also reiterated that, notwithstanding her young age, she remained very interested in having a sexual encounter with Solomon.

In response, Solomon sent two messages, each of which expressly rejected Detective Luvera's proposition on the basis that she was a minor. The detective nonetheless replied, "Cum on daddy? Age is only a number." Solomon rejected her proposition for a third time.

Over the next two hours, the detective continued sending him explicit messages expressing her eagerness to have a sexual encounter with him. In response, Solomon sent two messages in which he began to indicate a willingness to have intercourse with "Taylor," asking for pictures of her naked or in her underwear. He then suddenly renewed his rejection, stating, "I take everything back not interested at all this is a setup by cops or a website good luck to you."

---

[3] In the supplemental narrative to her incident report, Detective Luvera indicated that "[t]he photos I used were known people to law enforcement and had agreed to allow us to use their photos for this investigation and signed a release agreement."

- 3 -

Detective Luvera nevertheless persisted, replying, "yeah, I bet u a bj that u would jack off after seeing me in a my bra and thong ...... lol ur too hot!" Solomon yet again declined her advances, messaging, "Hahahahahahahahah what a set up."

Despite Solomon's rejections, the detective continued communicating with him and encouraging him to have sex with her ("I'm very descrete Josh and my privacy means everything to me too., I just think u are hot and wouldn't mind fucking u, but if ur not into what I got, my loss.").

In response to another of the detective's messages nearly 30 minutes later, Solomon requested proof that "Taylor" was not a police officer, including requesting that Taylor "friend" him on Facebook,[4] asking her what school she graduated from, and where her cell phone number was from. In response, Detective Luvera responded to his questions calling him "handsome" and "babe" and replying, "Do u quiz all ur dates before u fuck em?"

The next day, September 17, Detective Luvera renewed the conversation and continued to proposition Solomon. In response to the detective's prompting, Solomon e-mailed the detective a photograph of his penis. Solomon then requested that "Taylor" call him on his cellular telephone. Detective Luvera agreed and they spoke over the telephone.

On September 18, Detective Luvera sent messages to Solomon both via e-mail and via the messaging interface on Facebook. In her messages, she asked, "Can you cum see me later?" and sent Solomon a photograph with the

---

[4] Facebook is an online social media platform.

message, "I have more....like whatya see so far? Lol" and "hang on, I get ya a better one, just 4 u?"

On September 19, Solomon renewed the conversation and he and Detective Luvera continued messaging one another until Solomon agreed to visit "Taylor" at her home later that night. Shortly thereafter, Detective Luvera messaged Solomon and asked him to purchase lingerie—"U gonna buy me something to sexy to wear at VS?"—and alcohol—"Gonna bring me a little something sweet to drink baby? Like a wine cooler than I can lick off u? lol I go crazy over strawberry wine coolers...lol." She also demanded that Solomon pay her in exchange for a nude photograph or in anticipation of their planned sexual encounter—"Money....I mean either U pay for the pics or U pay to fuck my sweet pussy.....I know u want both.").

The messaging continued throughout the day with Detective Luvera sending Solomon sexually suggestive and explicit messages, including "Ur really r going to cum?," "U can take all u want of me after I get a piece of ur ass lol," "I'll meet u at the tennis crt bench with no panties on....wearing my tennis skirt," "now I'm wet....Don't even think ur cumming over here and teasing me," "U know how long it takes me to blow dry my hair? U can't cum in it either," "I'll have enough of u to drink up anyway," and "tellme baby what u want my mouth to do 2 u."[5]

_____

[5] Of the roughly 200 messages exchanged between Solomon and Detective Luvera, Detective Luvera sent nearly 60 percent.

That evening, Solomon arrived in the neighborhood near the address that Detective Luvera had given him and was approached by law enforcement officers alerted to the detective's operation. Solomon was arrested shortly thereafter. In a search of his person and his pick-up truck, law enforcement officers uncovered a sealed condom wrapper, $60 in cash,[6] a store receipt from earlier that day itemizing the purchase of a sex toy and lingerie, and a plastic bag containing the purchases itemized in the receipt.

Solomon was charged with one count of communication with a minor for immoral purposes, one count of commercial sex abuse of a minor, and one count of attempted rape of a child in the third degree.

Before trial, Solomon moved to dismiss the charges against him, arguing that the State had engaged in outrageous governmental misconduct in violation of his due process right to fundamental fairness.

The trial court granted Solomon's motion and ordered the charges against him dismissed.

II

A

In evaluating a trial court's determination that the State engaged in outrageous misconduct in violation of a defendant's due process right to fundamental fairness, we initially turn to our Supreme Court's decision in State v. Lively, 130 Wn.2d 1, 921 P.2d 1035 (1996).

---

[6] Earlier that day, Solomon had messaged Detective Luvera, "I hae 60 in my pocket."

1

In Lively, our Supreme Court recognized that the due process clause of the Fourteenth Amendment to the United States Constitution protects against conduct by state actors "'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" 130 Wn.2d at 19 (quoting United States v. Russell, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)); U.S. CONST. amend XIV. Such conduct "must be so shocking that it violates fundamental fairness." Lively, 130 Wn.2d at 19-20 (citing State v. Myers, 102 Wn.2d 548, 551, 689 P.2d 38 (1984); State v. Smith, 93 Wn.2d 329, 351, 610 P.2d 869 (1980)); accord Russell, 411 U.S. at 432.

> Establishing the outrageousness of the State's misconduct, however, requires more than a mere demonstration of flagrant police conduct. Myers, 102 Wn.2d at 551. Public policy allows for some deceitful conduct and violation of criminal laws by the police in order to detect and eliminate criminal activity. State v. Emerson, 10 Wn. App. 235, 242, 517 P.2d 245 (1973). Dismissal based on outrageous conduct is reserved for only the most egregious circumstances. "'It is not to be invoked each time the government acts deceptively[.]'" United States v. Sneed, 34 F.3d 1570, 1577 (10th Cir. 1994) (quoting United States v. Mosley, 965 F.2d 906, 910 (10th Cir. 1992)); see also State v. Pleasant, 38 Wn. App. 78, 83, 684 P.2d 761, review denied, 103 Wn.2d 1006 (1984).

Lively, 130 Wn.2d at 20.

In evaluating whether a defendant's due process right to fundamental fairness was violated, our Supreme Court instructed that "[a] violation of due process must be determined as a matter of law and it is the trial court which makes the findings of fact related to that decision." Lively, 130 Wn.2d at 24. It

"is . . . not a question for the jury." Lively, 130 Wn.2d at 19 (citing United States

v. Dudden, 65 F.3d 1461, 1466-67 (9th Cir. 1995), State v. Hohensee, 650

S.W.2d 268, 272 (Mo. App. 1982)).

The Lively court instructed that a trial court, in considering a claim of

outrageous governmental misconduct,

> should evaluate the conduct based on the "totality of the
> circumstances." United States v. Tobias, 662 F.2d 381, 387
> (1981), cert. denied, 457 U.S. 1108, 102 S. Ct. 2908, 73 L. Ed. 2d
> 1317 (1982); State v. Hohensee, 650 S.W.2d 268 (Mo. App. 1982).
> Each case must be resolved on its own unique set of facts and
> each component of the conduct must be submitted to scrutiny
> bearing in mind "proper law enforcement objectives—the
> prevention of crime and the apprehension of violators, rather than
> the encouragement of and participation in sheer lawlessness."
> People v. Isaacson, 44 N.Y.2d 511, 406 N.Y.S.2d 714, 378 N.E.2d
> 78, 83 (N.Y. 1978); [United States v.] Bogart, 783 F.2d [1428,] 1438
> [(9th Cir. 1986)]. The government conduct may be so extensive
> that even a predisposed defendant may not be prosecuted based
> on "the ground of deprivation of due process." Hohensee, 650
> S.W.2d at 271 (quoting United States v. Bagnariol, 665 F.2d 877
> (9th Cir. 1981)).

130 Wn.2d at 21-22.

As part of the totality of the circumstances evaluation, the Lively court

identified five factors to be considered by a trial court:

> [W]hether the police conduct instigated a crime or merely infiltrated
> ongoing criminal activity, ([United States v.] Harris, 997 F.2d [812,]
> 816 [(10th Cir. 1993)]); whether the defendant's reluctance to
> commit a crime was overcome by pleas of sympathy, promises of
> excessive profits, or persistent solicitation, (Isaacson, 378 N.E.2d at
> 83; [State v. ]Shannon, 892 S.W.2d [761, ]765 [(Mo. App. 1995)]);
> whether the government controls the criminal activity or simply
> allows for the criminal activity to occur (United States v. Corcione,
> 592 F.2d 111, 115 (2nd Cir.), cert. denied, 440 U.S. 975 and 440
> U.S. 985 (1979)); whether the police motive was to prevent crime or
> protect the public (Isaacson, 378 N.E.2d at 83; Shannon, 892
> S.W.2d at 765); and whether the government conduct itself
> amounted to criminal activity or conduct "repugnant to a sense of

justice." Isaacson, 378 N.E.2d at 83; United States v. Jensen, 69 F.3d 906, 910-11 (8th Cir. 1995), cert. denied, 116 S. Ct. 1571 (1996).

130 Wn.2d at 22.

Accordingly, in determining whether the State has engaged in outrageous misconduct, a trial court must consider whether the State's conduct was so shocking that it violated fundamental fairness—a totality of the circumstances inquiry that includes weighing the considerations outlined in Lively. 130 Wn.2d at 19, 21-22, 24.

2

Notably, although the Lively court set forth the legal standard applicable to a trial court's determination of outrageous governmental misconduct, the court did not set forth the standard of review applicable to such a determination. This was so because Lively had "raised this issue for the first time in her appellate brief," Lively, 130 Wn.2d at 18-19, and the trial court therein was thus never presented with the opportunity to rule on the due process issue.

Under these circumstances, the Supreme Court analyzed the uncontested evidence adduced at trial and the uncontested findings of fact entered by the court at sentencing. Using those facts as its record, the Supreme Court determined that law enforcement had therein engaged in unseemly manipulation and prosecution of a recovering drug and alcohol user, concluding that "there is no question that this conduct, as a matter of law, was so outrageous as to have violated due process principles." Lively, 130 Wn.2d at 22-27.

Thus, although the record in <u>Lively</u> did not include a trial court determination of whether the State engaged in outrageous misconduct, the undisputed evidence of misconduct of record therein allowed the <u>Lively</u> court to resolve the due process issue without the necessity of setting forth the applicable appellate standard of review.

## B

Nearly nine months later, our Supreme Court revisited the topic of outrageous governmental misconduct in <u>State v. Valentine</u>, 132 Wn.2d 1, 935 P.2d 1294 (1997). Although, as in <u>Lively</u>, the issue was "not raised at the trial court or at the Court of Appeals," <u>Valentine</u>, 132 Wn.2d at 22, the court nevertheless provided guidance regarding the appellate deference owed to a trial court in the context of an outrageous governmental misconduct claim.

As in <u>Lively</u>, the court in <u>Valentine</u> addressed the question of whether criminal charges against a defendant should be dismissed because the State's conduct had been "so outrageous as to be violative of his right to due process as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution." 132 Wn.2d at 22.

However, the <u>Valentine</u> court indicated that the record therein was "not at all like that which was confronted in <u>Lively</u>." 132 Wn.2d at 23. This was so, the court observed, "because the record we have been furnished does not permit us to reach a determination that the police acted in such an outrageous manner that due process considerations dictate dismissal of the charge against Valentine." <u>Valentine</u>, 132 Wn.2d at 23. Specifically, unlike the situation in <u>Lively</u>, wherein

undisputed evidence and findings could be relied upon by the court, the evidence regarding whether a State actor had, in actuality, engaged in the outrageous misconduct alleged by Valentine was contested by both parties. Valentine, 132 Wn.2d at 23.

Under these circumstances, our Supreme Court declined to resolve the factual disputes.

> Those facts, however, are not to be resolved at the appellate court, nor should we view them in the light most favorable to the defendant. Resolution of factual disputes is a task for the trier of fact, not this court. Lillig v. Becton-Dickinson, 105 Wn.2d 653, 657, 717 P.2d 1371 (1986).
> Unfortunately, the trial court was not asked to make findings of fact on this issue.

Valentine, 132 Wn.2d at 23-24.

The court concluded, notwithstanding its misgivings about the veracity of the law enforcement officers' trial testimony, that

> in the absence of findings of fact or undisputed facts showing outrageous conduct by the Spokane police officers, we cannot say that their conduct was violative of due process. Consequently, we are unwilling to direct dismissal.

Valentine, 132 Wn.2d at 24.

The Valentine court thus emphasized that an appellate court should neither weigh the underlying facts nor resolve factual disputes prior to determining an outrageous governmental misconduct claim. Rather, the court instructed that such tasks are properly reserved to the trial court. Valentine, 132 Wn.2d at 23-24 (citing Lillig, 105 Wn.2d at 657).

C

A decade later, for the first time, a claim of outrageous governmental misconduct was presented to the Supreme Court in a case in which a full trial court record was extant. In State v. Athan, law enforcement officers, "posing as a fictitious law firm, induced Athan to mail a letter to the firm." 160 Wn.2d 354, 362, 158 P.3d 27 (2007). They did so in order to obtain a sample of his DNA. Athan moved to dismiss the charges against him pursuant to both CrR 8.3(b) and a claim of violation of his due process right to fundamental fairness. Athan, 160 Wn.2d at 364. The trial court therein had

> denied Athan's motion to dismiss because, after looking at a totality of the circumstances, it found the police were acting to protect the public by solving the crime, the illegal activity engaged in was only a misdemeanor, and the police conduct was not repugnant to a sense of justice.

Athan, 160 Wn.2d at 376.

On direct Supreme Court review, Athan asserted that the trial court erred because the charges against him "should be dismissed under CrR 8.3(b) and the due process clauses of the state and federal constitutions." Athan, 160 Wn.2d at 376.

Significantly, in setting forth the standard of review, our Supreme Court announced that it would review the trial court's denial of Athan's motion to dismiss "under an abuse of discretion standard." Athan, 160 Wn.2d at 375. "Abuse of discretion," the court stated, "requires the trial court's decision to be manifestly unreasonable or based on untenable grounds or untenable reasons."

Athan, 160 Wn.2d at 375-76 (citing State v. Michielli, 132 Wn.2d 229, 240, 937 P.2d 587 (1997)).[7]

In reviewing the trial court's determination for abuse of discretion, the court concluded that

> [t]he claimed misconduct in this case does not involve actions similar to those cases which found misconduct warranting dismissal. The police did not induce Athan to commit any crime here nor did they attempt to gain any confidential information from the ruse. The conduct here is not so outrageous as to offend a sense of justice or require dismissal of this case.

Athan, 160 Wn.2d at 378.

D

As indicated, the motion to dismiss in Athan was brought on two bases: governmental misconduct pursuant to CrR 8.3(b) and outrageous governmental misconduct.

On appeal, our Supreme Court utilized the same standard of review in reviewing each claim. The claims were separate because they address different concerns.

CrR 8.3(b) reads:

> The court, in the furtherance of justice, after notice and hearing, may dismiss any criminal prosecution due to arbitrary action or governmental misconduct when there has been prejudice to the rights of the accused which materially affect the accused's *right to a fair trial*.

---

[7] In concurring, Justice Alexander also granted deference to the trial court. Reasonable minds may differ regarding the trial court's and the majority's conclusion that the ruse employed here was not repugnant to a "sense of justice." Majority at 378. However, in my view, the extraordinary remedy of dismissal is not called for in this case because the trial court's reasoning for denying the motion was not manifestly unreasonable or untenable. Athan, 160 Wn.2d at 390-91 (Alexander, C.J., concurring).

(Emphasis added.) Therefore, by its plain terms, CrR 8.3(b) applies only to a claim that the right to a fair trial was compromised. The Athan court recognized this. 160 Wn.2d at 375 (quoting CrR 8.3(b)).

The outrageous governmental misconduct claim was targeted at a different claimed evil, a deprivation of fundamental fairness. Nevertheless, the Athan court utilized the same standard of review–abuse of discretion—when analyzing the claim. 160 Wn.2d at 375.

The court's analysis makes sense. As a fundamental matter, a governmental misconduct claim pursuant to CrR 8.3(b) is predicated on a violation of the right to a fair trial, a right guaranteed by the Fourteenth Amendment's due process clause. State v. Davenport, 100 Wn.2d 757, 762, 675 P.2d 1213 (1984) (citing Smith v. Phillips, 455 U.S. 209, 220-21, 102 S. Ct. 940, 71 L. Ed. 2d. 78 (1982)). Relatedly, an outrageous governmental misconduct claim is predicated on a violation of the right to fundamental fairness, also a right guaranteed by the Fourteenth Amendment's due process clause. Lively, 130 Wn.2d at 19 (citing Russell, 411 U.S. at 432).

Consequently, by providing a mechanism for relief when the State violates a defendant's due process right to a fair trial, CrR 8.3(b) provided the Athan court with an analytical framework for determining whether the State's conduct constitutes a violation of a *related* due process right—specifically, the right to fundamental fairness. Given that, it was sensible for the Athan court to utilize the same abuse of discretion standard of review that it routinely applied in reviewing trial court CrR 8.3(b) rulings.

- 14 -

Here, Solomon moved to dismiss the charges against him on the basis that the State had engaged in outrageous misconduct in violation of his due process right to fundamental fairness. The trial court dismissed the charges against him on that basis. During the proceeding, neither Solomon nor the trial court relied on CrR 8.3(b).

The State contends that we cannot utilize an abuse of discretion standard in reviewing the trial court's order because Solomon did not move to dismiss the charges against him pursuant to CrR 8.3(b). We disagree. It is plain that Athan compels the use of that very standard.

III

The State assigns error to the trial court's ruling that the State engaged in outrageous misconduct in violation of Solomon's right to due process.

The Fourteenth Amendment protects against conduct by state actors "'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction.'" Lively, 130 Wn.2d at 19 (quoting Russell, 411 U.S. at 431-32). This State conduct "must be so shocking that it violates fundamental fairness." Lively, 130 Wn.2d at 19-20 (citing Myers, 102 Wn.2d at 551; Smith, 93 Wn.2d at 351); accord Russell, 411 U.S. at 431-32.

A trial court "must examine the totality of the circumstances to determine when the conduct becomes so outrageous that a reversal of a conviction is required." Athan, 160 Wn.2d at 377. In consideration of the totality, a trial court does not consider each aspect of the State's conduct in isolation. Indeed, "[t]he totality-of-the-circumstances test 'precludes this sort of divide-and-conquer

analysis.'" District of Columbia v. Wesby, ___ U.S. ___, 138 S. Ct. 577, 588, 199 L. Ed. 2d 453 (2018) (quoting United States v. Arvizu, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002)).

We review a trial court's order on a motion to dismiss on the basis of outrageous governmental misconduct "under an abuse of discretion standard." Athan, 160 Wn.2d at 375. "Abuse of discretion requires the trial court's decision to be manifestly unreasonable or based on untenable grounds or untenable reasons." Athan, 160 Wn.2d at 375-76 (citing Michielli, 132 Wn.2d at 240). A trial court abuses its discretion when its decision adopts a view that no reasonable person would take. State v. Sisouvanh, 175 Wn.2d 607, 623, 290 P.3d 942 (2012).

Here, the trial court entered several findings of fact regarding the outrageousness of Detective Luvera's conduct. The trial court first found that law enforcement had instigated the criminal activity at issue. At the hearing, the trial court found:

> There is no question how this came to be, that the first thing that happened was, in order to respond to something, there has to be something to respond to.
> Detective Luvera -- and let me say this about Detective Theresa Luvera. I've known Detective Luvera for years and she's been the lead detective on a number of the largest cases we've had here in Skagit County. Detective Luvera is an extremely capable and competent and confident detective. But I think she went over the top on this one.
> Anyway, she instigated the thing, got it started, got the ball rolling by placing an ad on Craigslist.
> And I understand on Craigslist you can buy furniture, automobiles, musical instruments, and partners if you hit the right keystroke. So an ad was placed on the Craigslist -- what was that called again, Mr. Freeman?
> MR. FREEMAN: Casual encounters.

THE COURT: -- casual encounters part of it for people to hook up or connect with each other. And it was on the casual encounters, over 18.

And I'm assuming Craigslist -- I don't know about how they exactly run their business, but I'm assuming that they don't have a website in there that would allow a person to look for minors. So I'm assuming Craigslist standards would say you've got to be over 18 to get into this deal.

So Craigslist has a website known as casual encounters, you've got to be over 18 to solicit on that, and you need to be over 18 to respond on that, I'm assuming, under Craigslist standards.

So Mr. Solomon, on September 12th at 2:40, he responds and says, "only interested in woman." He's obviously referring to the Craigslist post by the detective. Nothing happens.

About four hours later, three and a half hours later, at 6:16, Mr. Solomon replies, "must be I won't bug you anymore."

At that point in time, I guess the detective has a prong in the road. One is, okay, I can spend my time looking for someone who really took the hook and ran with it and spend my time going after those people and cut – and cut this one right here because this individual, whoever this Mr. Solomon is, decided he doesn't want to bug me anymore, and end it. Or the detective can take the other prong, which is, well, you know, I've got nothing else to do, maybe I can set the hook on this Mr. Solomon and we'll see if we can reel him in a little bit. So that's what prong Detective Luvera takes.

So the next morning at September 16, Tuesday morning at 10:00 a.m., Detective Luvera instigates the first contact. And I think that's important as to who instigated this and got the ball rolling.

The trial court found that law enforcement had instigated the criminal activity herein by publishing the "casual encounters" advertisement on Craigslist and by initially messaging Solomon even though he had indicated that he would not again contact the individual who had posted the advertisement.

The trial court next found that law enforcement had engaged in persistent solicitation that overcame Solomon's reluctance to commit the underlying criminal conduct. Specifically, the trial court found:

[T]he next morning at September 16, Tuesday morning at 10:00 a.m., Detective Luvera instigates the first contact. . . .

- 17 -

She says "LOL" -- LOL is laugh out loud -- "your not bugging me. I was camping and have no cell service. I'm not against guys and sex, done it a few times . . . I'm just really liking sex with girls right now. What you thinking?" And Mr. Solomon responds.

They get through the three -- eight or ten initial back and forths over what's your name and that kind of thing. And by about half an hour later or so, Mr. Solomon says, "wow," when it's disclosed that she's 15.

Actually, Detective disclosed that, "I'm almost 15 but waaay advanced, I'm taking college courses because high school was so stupid . . . I'm totally descreet . . . like my dads friends . . . r u up for me . . . cum on, Josh."

So Josh then replies, "wow, 15," probably "not the best idea sorry I'm not willing to get in trouble . . . maybe hit me up in 3 years if your still around girl," period.

Now, once again, Detective's got two forks in the road. One is, okay, this guy twice now has told me he's not -- he's refused to take the bait because I'm 15, end this operation right now, spend my time going after somebody who's going to actually be impressed by the fact that I'm a minor.

Or the other prong in the road, can I -- should I continue to let the line out a little bit and see if I can hook this guy in a little deeper. Detective takes that prong again.

The next comment is from Mr. Solomon. "Wow 15," probably "not the best idea sorry I'm not willing to get in trouble . . . maybe hit me up in 3 years if your still around girl. Your dad's friends got balls."

Another fork in the road. Detective chooses the one to see if she can let the line out a little more, and Mr. Solomon, stupid enough at the time to keep taking the line. And they go through this little drill for a while.

Mr. Solomon again says, "As tempting as it is I'm gonna have to say . . . something doesn't add up . . . you . . . really don't want to get a rape charge that would be no good for me." The detective keeps going and they chat.

1:00 in the afternoon, they're back again. Mr. Solomon says, "I take everything back." I'm "not interested at all this is a setup by the cops . . . good luck to you."

Mr. Solomon, 2:18, says, "prove it . . . girl what school did you go to where is your cell number." And then they start talking about some Facebook exchanges and -- in an attempt by Mr. Solomon -- it's pretty obvious from the textual content that he's looking for some proof about age wanting a Facebook site or something, pictures, a name, a school, et cetera. So this goes on all afternoon back and forth.

> Then on Wednesday, the next day, September 17, 9:46 in the morning, the detective instigates it again. First text sent, "Hey whazzzzzzzz up hottie? Lol I'm bored," and they discuss again, keep talking. The detective then -- and on it goes.
>
> So as you say, Mr. Freeman, about seven times there was an innuendo or an indication by Mr. Solomon that he wanted out and would end it, and all seven times, those forks in the road, the detective chose to take the one letting the line out to see if she could keep reeling him in. And as you said, about 60 percent or so, three in five of the texts were instigated by the detective.
>
> So I think that fits the bill for whether the defendant's reluctance to commit the crime was overcome by persistent solicitation. It was persistent. You can't read this and not say it wasn't -- if Detective Luvera is one thing, she is persistent in everything she does.

The trial court thus found that Solomon's reluctance to commit the crime was manifested by his repeated—seven times—attempts to discontinue the conversation. The trial court further found that the State had engaged in persistent solicitation of Solomon, given that the detective continued to solicit him each of the seven times that he sought to withdraw and, in addition, sent the majority of the over 200 messages exchanged between the two parties.

The trial court also found that the State had controlled the criminal conduct.

> The government controlled this. They started it, they initiated it. The first three days -- on Thursday, the next day, the third day in the situation, 8:46 in the morning, first text, Detective, "Hey, sorry babe, I just got home. My dad showed up . . . and made me go to his house . . . I will friend you right now. Do u hate me?" And they talk again.

The trial court thus found that Detective Luvera controlled the criminal conduct both by initiating the interaction between her and Solomon and by stringing him along over the course of the four days of exchanges.

The trial court next found that the conduct by law enforcement was repugnant to a sense of justice.

> I can't believe the detective would want to go to trial on this and subject this language to citizens.
>
> I'm just going to give you a little tidbit. At 3:17 on Wednesday, September 17th, the detective says, "OMG U R so f'ing hung baby!!! WTF . . . I'm so amped up after seeing this. I have wait for my sister to leave and I am gonna video tape me finger banging me to ur pic! Can't u cum and see me now!!!"
>
> Yeah, that's repugnant. I don't care how you cut that pie. You can be a seasoned old sailor or whatever, but that is repugnant. That's a detective letting line out very fast on a free spool trying to get Mr. Solomon back in the game. And there is no other way to -- there is no other way to describe it. It's outrageous. That is repugnant. It's egregious.
>
> I'm not saying that the facts in this case are as egregious as Lively where they go and solicit a lady who's tried to commit suicide in the AA meeting, but the facts in this are egregious enough to meet the standards in Lively.
>
> . . .
>
> And we'll see -- I hope this goes to the Court of Appeals because, as I said, we have an impasse. It's three prosecutors versus three judges, three judges who have all looked at this. Interesting to see what the Court of Appeals thinks, or the Supreme Court, as to whether or not this is.[8]
>
> Because I think we really do -- I'm not the genius on this. My word shouldn't be the final say. I think we do need -- because it's been a long time since Lively. This is -- this happens all the time. The sex trade on the internet is a horrendous problem. The detectives and law enforcement have to do something to do that, they need to do stings, but we need to have a line about how far is too far, and I think this is a good one to do that on.
>
> So more power to appellate courts and the Court of Appeals on this, and they can take a look at it.

---

[8] At an earlier hearing, the trial judge had urged the deputy prosecutor to run the case by other prosecutors. The judge mentioned that he would be doing the same with his judicial colleagues, each of whom were former prosecutors. The trial judge was a judge with 30 years of judicial experience who had previously served as the elected county prosecutor.

But to this judge's way of thinking, who is -- who did spend five years in the service, three of them overseas and have seen a few monkeys and footballs, I find it outrageous and over-the-top.[9]

In this way, the court determined that the detective's use of graphic and highly sexualized language amounted to a manipulation of Solomon that was repugnant to a sense of justice.

Ultimately, the trial court concluded that, considering the totality of the circumstances, law enforcement engaged in outrageous conduct that deprived Solomon of the right to due process. The trial court then dismissed the charges.

In ruling to dismiss the charges, the trial court did not adopt a view that no reasonable judge would take. Given the court's finding that law enforcement had initiated and controlled the criminal activity, persistently solicited Solomon to commit the crimes so initiated, and acted in a manner (through the use of language and otherwise) repugnant to the trial judge's view of the community's sense of justice, the trial court's determination was tenable.

Accordingly, the trial court did not abuse its discretion by ordering that the charges against Solomon be dismissed.[10] There was no error.

---

[9] Under the circumstances, the trial court did not feel that it needed to reach a determination on a more likely than not basis as to whether law enforcement engaged in conduct that itself constituted criminal activity:

[W]hether the government conduct amounted to criminal activity or conduct. There was a request I saw in there for a wine cooler or something and she was 15 and they did talk money. Whether or not that rises to solicitation for criminal activity by the State, I don't know. That's subject to debate. But it certainly could be – it certainly could be.

The trial court also found that it was "probably a push" as to "[w]hether the police motive was to prevent a crime or protect the public."

[10] The State's argument on appeal is predominantly one directed at Solomon's conduct. This misses the target. Unlike "the subjective approach of entrapment," where "the focal issue is the predisposition of the defendant to commit the offense," an outrageous governmental misconduct inquiry focuses "on the State's behavior." Lively, 130 Wn.2d at 19, 22 (citing United States v. Luttrell, 889 F.2d 806, 811 (9th Cir. 1989)). While a defendant's actions are relevant to

Affirmed.

We concur:

_____Dwyer, J._____

_____Mann, A.C.J._____          _____Leach, J._____

---

whether the State engaged in outrageous misconduct, it is the actions of state agents that is the focal point.