IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>        v.<br><br>EZRA DANILO WRIGHT,<br><br>               Appellant. | No. 81834-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

SMITH, J. — Ezra Wright appeals his conviction for attempted rape of a child after he was arrested in a sting operation conducted by the Missing and Exploited Children's Task Force (MECTF). He contends that the trial court erred by declining to instruct the jury on entrapment and that the government engaged in such outrageous conduct that due process barred his conviction. In a statement of additional grounds (SAG), he also contends that (1) the trial court abused its discretion by revoking Wright's access to social media as part of the felony judgment and sentence and (2) MECTF's sting operation used fictional children to cause the imposition of an unfairly long sentence.

We conclude that Wright did not present sufficient evidence to require an entrapment instruction and that the State's conduct did not violate due process. Furthermore, we conclude that the facts linking Wright's crime to social media usage are sufficient to permit the restriction of social media and that the fact that there are only fictional victims does not require a lighter sentence under the statutory scheme. Therefore, we affirm.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

In September 2016, MECTF posted an advertisement in the Craigslist casual encounters section entitled "Family Play Time!?!? – w4m."[1] The ad stated, "Mommy/daughter, Daddy/ daughter, Daddy/son, Mommy/son . . . you get the drift. If you know what I'm talking about hit me up we'll chat more about what I have to offer you."

Wright, a 20-year-old soldier stationed at Joint Base Lewis-McChord, responded to the ad, saying he was interested and asking if they could speak more. Krista Kleinfelder, a member of MECTF posing as "Hannah Jacobs," responded. She wrote, "I'm not interested in RP,[2] only someone serious. [I]'m a single mother of three young kids 13, 11, 6[ ] and looking for someone to teach my kids. . . . this is taboo and not for everyone." She included a phone number that Wright could text her at if he was "serious."

At 1:19 p.m. on September 9, Wright texted Kleinfelder,[3] and the two had the following exchange:

[Wright:] I'm open to whatever

[Wright:] It depends on what you want out of this

[Kleinfelder:] Did you have experience with younger kids?

[Wright:] How much experience do you need? And what exactly would I do?

[Kleinfelder:] I just want someone you knows how to make it fun for my girls without them experiencing pain

---

[1] "[W]4m" is an abbreviation that means women for men.
[2] The detective explained RP is an abbreviation for role-playing.
[3] Wright's text records indicate that while he was texting with Hannah, he was also responding to other Craigslist ads to meet up with someone.

[Wright:]  What do you want me to do with them?

[Kleinfelder:]  I'd like to watch someone have sex with them.

[Wright:] Can you send a picture of them?

When Kleinfelder declined to immediately send a picture of her "children," Wright responded, "What about of you." Kleinfelder sent Wright a picture of herself with two other undercover law enforcement officers posing as her children. The picture had a Snapchat puppy filter applied to it which obscured the officers' faces and made them look younger. Wright replied, "The girl is cute. Do you wanna meet up sometime?" Kleinfelder expressed doubts that he was "for real," and the two had the following exchange:

[Wright:]  I'm real

[Wright:]  I'm military I'm not supposed to be in this

[Kleinfelder:]  not sure what that means

[Kleinfelder:]  I have rules the first one is honesty and the next is directness.  I don't feel I'm getting either from you.  I'm trying to filter out the fakes and I think y [sic]

[Wright:] This is illegal in a lot of ways

[Wright:]  We can meet if that makes you feel better

[Kleinfelder:]  me and my family live a discreet life filled with taboo. i don't think it's wrong but other do so I have to be careful

[Wright:]  I just don't want to get in trouble with the law

[Wright:]  Do you want to meet tonight?

[Kleinfelder:]  i understand.  then this is not for you

[Kleinfelder:]  for what?

3

[Wright:]  Can we at least meet first?

[Wright:]  Because I wanna make sure you're not a cop before I agree to this

Kleinfelder asked Wright to send her a picture of him.  When he did, she said, "you[']r[e] attractive.  [B]ut tell me specifically what you want with me kids," and Wright responded, "I'll have sex with the girls . . . [b]ut not the male."  Kleinfelder asked, "How big are you[?  T]he six year old is kind of small.  I would also require condoms," and Wright responded, "I'm 5'5".  I have condoms.  Can you send me a pic of just the girls?"  He subsequently asked, "Do they both consent to this?  They're not gonna tell anyone else?," and Kleinfelder responded, "[T]hey [know] we don't talk about playtime[.  W]e have our little secrets.  They are both very excited."  Wright responded, "When are you available?"

The two arranged to meet up that night.  Wright indicated that he was interested in "[j]ust the 11[-year-old] for now."  He asked if they could meet in Puyallup, but Kleinfelder indicated he should come to her home in Tumwater.  He agreed, saying, "Ok.  I hope you're not a cop."  He continued to express caution, asking if she and her daughter could come outside first when he got to their home, asking if her home was isolated, and asking if they could meet somewhere neutral first.  Kleinfelder answered his questions and said, "It's ok if you don't want to come here.  You can walk away I'd understand."  He asked if tomorrow worked for her, and she said, "[S]orry [I]'m done with these games."  Wright then agreed to come to her home that night.

Around 10 p.m. on September 9, Wright arrived at the address that

4

Kleinfelder had told him.  After meeting Kleinfelder, he went inside the house and was promptly arrested by officers inside.  He had a single condom in his pocket and a box of condoms in his car.  He was charged with one count of attempted rape of a child in the first degree.

At trial, after the State presented the above evidence, the court heard argument about instructing the jury on entrapment.  Wright contended that the fact that Kleinfelder was the one who brought up having sex with the girls, that Wright took several hours to agree to do so, and that at one point Kleinfelder was the one to reinitiate texting after a 30-minute break in the conversation all pointed toward entrapment.  The court determined that there was inadequate evidence to support the entrapment instruction and did not provide it to the jury.

The jury found Wright guilty.  Wright appeals.

ANALYSIS

Sufficiency of Evidence for Entrapment Instruction

Wright contends that the trial court erred when it declined to instruct the jury on entrapment.  We disagree.

We review a trial court's decision regarding jury instructions de novo to the extent it is based on legal conclusions and for abuse of discretion to the extent it is based on factual determinations.  State v. Condon, 182 Wn.2d 307, 315-16, 343 P.3d 357 (2015).  In determining whether the evidence is sufficient to support a jury instruction on an affirmative defense, we view the evidence in the light most favorable to the defendant.  State v. O'Dell, 183 Wn.2d 680, 687-88, 358 P.3d 359 (2015).

The defense of entrapment is defined in RCW 9A.16.070: "In any prosecution for a crime, it is a defense that (a) The criminal design originated in the mind of law enforcement officials, or any person acting under their direction, and (b) The actor was lured or induced to commit a crime which the actor had not otherwise intended to commit." RCW 9A.16.070(1). However, if "law enforcement officials merely afforded the actor an opportunity to commit a crime," the defendant was not entrapped. RCW 9A.16.070(2). Neither the use of a "normal amount of persuasion," nor the use of "deception, trickery, or artifice" by the police is sufficient to establish this defense. State v. Trujillo, 75 Wn. App. 913, 918, 883 P.2d 329 (1994). Furthermore, a defendant must show more than "mere reluctance on [their] part to violate the law" to establish entrapment. Trujillo, 75 Wn. App. at 918.

A defendant is entitled to a jury instruction for an affirmative defense if sufficient evidence supports the defense. State v. Fisher, 185 Wn.2d 836, 848-49, 374 P.3d 1185 (2016). The "defendant must present evidence which would be sufficient to permit a reasonable juror to conclude that the defendant has established the defense of entrapment by a preponderance of the evidence." Trujillo, 75 Wn. App. at 917. The defendant may point to evidence presented by the State to support the instruction but may not point to an absence of evidence. Fisher, 185 Wn.2d at 851.

In this case, Wright failed to point to evidence that could permit a reasonable juror to conclude that he was entrapped. Wright may have established that the criminal act originated in the mind of law enforcement, but he

6

did not point to any evidence that establishes that he was "lured or induced" to commit the crime. Wright did not express any reluctance to have sex with a girl he thought was 11 years old; he only expressed concern that Kleinfelder was a law enforcement officer and that he would be caught breaking the law. At most, this evidence showed only a "mere reluctance . . . to violate the law." Trujillo, 75 Wn. App. at 918. And while Kleinfelder did deceive Wright, the posting of the ad and the subsequent conversation merely provided Wright with "an opportunity to commit a crime." See RCW 9A.16.070(2). Kleinfelder did not engage in more than a "normal amount of persuasion" and indeed told Wright that she would not be mad if he did not want to go forward. Trujillo, 75 Wn. App. at 918.

Wright contends that Kleinfelder improperly continued to steer the conversation toward sex with the children, but the record does not support this contention. For instance, Wright asserts that when he asked to see a picture of the "mother," Kleinfelder quickly changed the topic and instead sent him a picture of the children. But the record shows that Wright's initial request was for a picture of the children, and he then continued to ask for pictures of both the children and of Kleinfelder. Kleinfelder responded to both of these requests by sending a "family photo." Ultimately, the text conversation does not show that Kleinfelder lured or induced Wright to agree to have sex with a child.

Wright compares this case to State v. Chapman, No. 50089-2-II (Wash. Ct. App. Jan. 23, 2019) (unpublished), http://www.courts.wa.gov/opinions/pdf/D2%2050089-2-II%20Unpublished%20Opinion.pdf. In this unpublished case discussing a similar

sting operation that led to attempted child rape charges, the court held that an entrapment instruction was required where the defendant had presented evidence that he had stopped talking to the fictional mother for two days. Chapman, No. 50089-2-II, slip op. at 5, 10-11. When the fictional mother reinitiated contact, and before he met her and her fictional daughter, he asked her to promise he could have sex with her. Chapman, No. 50089-2-II, slip op. at 5-6. Because the defendant had presented evidence that he did not otherwise intend to commit the crime, he met his burden and was entitled to the entrapment jury instruction. Chapman, No. 50089-2-II, slip op. at 10-11. Here, Wright presented no such evidence. There was no discussion of Wright having sex with the fictional mother, Wright did not express attraction to her, and he expressed a willingness to meet up based only on an agreement to have sex with the 11-year-old. While Wright contends in his brief that he wanted to meet with the mother rather than the daughter, he did not present the jury with any evidence that this was the case.

Finally, Wright contends that the court improperly weighed the proof and evaluated witness credibility. The record does not support this assertion. The court explained its reasoning that the lapse in time in the texts was not significant and that Kleinfelder's text messages discussing sex with children served to clarify her proposal rather than lure Wright. The court did not address witness credibility in its decision to deny the entrapment instruction. The court only considered whether there was sufficient evidence to support the instruction, as required by Fisher, 185 Wn.2d at 848-49. Thus, the court did not err by denying

the entrapment instruction.[4]

<u>Outrageous Government Conduct</u>

Wright contends that the State's conduct in this case was so outrageous that due process should bar the State from seeking his conviction. We disagree.

The question of whether the State has engaged in outrageous conduct in violation of the defendant's due process rights is a question of law. <u>State v. Lively</u>, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996). We therefore review this question de novo. <u>State v. Lyons</u>, 199 Wn. App. 235, 240, 399 P.3d 557 (2017).

The principle of outrageous government conduct focuses solely on the actions of the State and bars the use of judicial processes to obtain a conviction if the State's actions are so shocking that they violate fundamental fairness. <u>Lively</u>, 130 Wn.2d at 19. This doctrine is not triggered by mere deceitful conduct but instead is reserved for the "most egregious circumstances." <u>Lively</u>, 130 Wn.2d at 20. We consider several factors to determine whether police conduct reaches this level: (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity," (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation," (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur," (4) "whether the police motive was to prevent crime or protect the public," and (5) "whether the

---

[4] Wright further contends in his statement of additional grounds (SAG) that the defendant need not admit a crime to allow the entrapment instruction. Because we affirm the denial of the entrapment instruction on other grounds, we need not address this contention.

government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.'" Lively, 130 Wn.2d at 22 (quoting People v. Isaacson, 44 N.Y.2d 511, 378 N.E.2d 78, 406 N.Y.S.2d 714, 719 (1978)).

In State v. Solomon, we declined to reverse a trial court's determination that there was outrageous State conduct in a similar Craigslist sting. 3 Wn. App. 2d 895, 916, 419 P.3d 436 (2018). In that case, the court found that law enforcement had (1) instigated the criminal activity by not only posting an advertisement on Craigslist, but by then messaging Solomon even after he indicated he would not again contact the poster, (2) engaged in persistent solicitation by continuing to text him after he indicated that he was not interested on seven occasions, and (3) controlled the conduct by initiating most of the texting exchanges and by continuing to string him along over several days. Solomon, 3 Wn. App. 2d at 910-14. Finally, the court found that the law enforcement's conduct was repugnant to a sense of justice because the detective, acting as a 15-year-old, sent explicitly lewd messages to the defendant. Solomon, 3 Wn. App. 2d at 914-15.

The circumstances of this case do not support a finding of outrageous state conduct. The first factor, whether police instigated the crime or merely infiltrated ongoing activity, does not weigh one way or another. While law enforcement arguably instigated the activity by posting the ad and bringing up sex with children, Wright twice initiated communication by voluntarily responding to the ad and sending the first text message after learning what the fictional mother was looking for. The record indicates that MECTF posted ads using

language it found from real ads on Craigslist, which indicates that there may be at least some ongoing criminal activity.

With regard to the second factor, Wright did not express a reluctance to continue, he only expressed concern about being caught by law enforcement. There was none of the persistent solicitation that was present in Solomon, and law enforcement did not have to appeal to sympathy, profit, or other motivators for Wright to agree. The second factor does not indicate that the State's conduct was outrageous.

As to the third factor, law enforcement did not control the conduct. Wright asked Kleinfelder when she was available, and she said she could meet that night. Although she specified the location, Wright agreed to travel there within several hours of their first text messages. Wright contends in his brief and in his SAG that law enforcement controlled the communication by, for instance, steering the conversation toward sex with the daughters and threatening to break off the conversation if he did not agree to meet at her home. However, the record indicates that while Kleinfelder was the first to bring up the question of sex with children, Wright was not averse to the subject, readily asked for more information, and eventually agreed. Furthermore, while law enforcement did set the time and location for the meeting, this was after Wright initially asked when Kleinfelder was available.

Finally, law enforcement did not engage in the lewd, proactive, and extended communications that characterized Solomon but instead arrested someone who fairly readily expressed an intention to have sex with an 11-year-

old.  Law enforcement acted with an interest in protecting the public, and their actions are not "'repugnant to a sense of justice.'"  Lively, 130 Wn.2d at 22 (quoting Isaacson, 406 N.Y.S.2d at 719).  Thus, the fourth and fifth factors both indicate that this was not outrageous State conduct.

Wright makes several additional contentions in his SAG.  He contends that the fifth element of outrageous conduct is met because the State conduct amounted to criminal activity.  He contends MECTF was violating the Washington privacy act, chapter 9.73 RCW, by recording his conversations.  Specifically, RCW 9.73.030(1) provides that it is unlawful to intercept or record any "[p]rivate communication transmitted by telephone . . . or other device" with a device designed to record or transmit that communication without first obtaining the consent of all the participants in the communication.  However, our Supreme Court has held that an e-mail sender consents to the recording of the e-mail, because the e-mail user necessarily understands that their message will be recorded on the recipient's computer.  State v. Townsend, 147 Wn.2d 666, 676, 57 P.3d 255 (2002).  Similarly, the sender of a text message impliedly consents to the recipient's phone recording the text message.  State v. Racus, 7 Wn. App. 2d 287, 299-300, 433 P.3d 830, review denied, 193 Wn.2d 1014 (2019).  Thus, the State did not violate the Washington privacy act.[5]

Wright also asserts that the State's conduct was outrageous because it

---

[5] Wright also appears to contend that the post was unlawful because it violates the Allow States and Victims to Fight Online Sex Trafficking Act of 2017, Pub. L. No. 115-164 (2018).  However, as Wright notes, this act was passed after the post in his case.  Thus, we need not address it.

did not comply with the Internet Crimes Against Children (ICAC) Program Operational and Investigative Standards, which he contends MECTF must comply with. Specifically, he argues that law enforcement "set the tone, pace, and subject matter of the conversation" in violation of the ICAC standards. However, even if we accept this as true, there is no indication that this would make the State's conduct criminal or otherwise so outrageous that it violated Wright's due process rights.

Finally, Wright contends that MECTF, in performing sting operations, has exceeded its statutory authority, because the statute establishing the task force discusses only cases "involving missing or exploited children." RCW 13.60.110. While the statute does not specifically mention stings such as the one that led to Wright's arrest, where no children are involved, Wright does not show that this compromises the constitutionality of his arrest, trial, or conviction. Wright cites State v. Glant, in which the court considered whether a private organization's funding of the task force caused the State's conduct to be so outrageous as to violate his due process rights. 13 Wn. App. 2d 356, 370-71, 465 P.3d 382 (2020). Wright's reliance is misplaced, both because he does not raise similar facts and because the court in Glant concluded that the State action was not improper. 13 Wn. App. 2d at 371.

We therefore conclude that the State's actions did not violate Wright's due process rights and reversal of Wright's conviction is not required.

Social Media Provision of Community Custody

Wright contends that we should strike the community custody condition that bars his access to social media websites, including "[F]acebook, [I]nstagram, [S]napchat, and chat rooms." We disagree.

We review a trial court's imposition of crime-related community conditions for abuse of discretion. State v. Cordero, 170 Wn. App. 351, 373, 284 P.3d 773 (2012). Trial courts may impose crime-related prohibitions on a defendant in community custody. Former RCW 9.94A.505(9) (2015). These prohibitions must be reasonably related to the circumstances of the crime committed by the defendant. RCW 9.94A.030(10); State v. Kinzle, 181 Wn. App. 774, 785, 326 P.3d 870 (2014). We "review[ ] the factual bases for crime-related conditions under a 'substantial evidence' standard." State v. Irwin, 191 Wn. App. 644, 656, 364 P.3d 830 (2015) (quoting State v. Motter, 139 Wn. App. 797, 801, 162 P.3d 1190 (2007), overruled on other grounds by State v. Sanchez Valencia, 169 Wn.2d 782, 791, 239 P.3d 1059 (2010)).

In Irwin, we upheld a restriction prohibiting the defendant from possessing or maintaining access to a computer where the defendant had previously stored child pornography images on his computer. 191 Wn. App. at 658. In this case, although Wright also used a computer as part of his crime, the restriction is much narrower. While social media is an amorphous concept, we note that Craigslist has many features similar to the forums listed in the court's order, including the ability to post text and pictures, and to invite replies to that content. Thus, it was not manifestly unreasonable to conclude that substantial evidence links social

media to Wright's crime.  See State v. Riley, 121 Wn.2d 22, 37, 846 P.2d 1365 (1993) (A court abuses its discretion if its decision is manifestly unreasonable.).

Wright disagrees and further contends that the restriction is overly broad, because it would hinder his ability to pursue many legitimate functions on the internet and therefore infringe on his constitutional rights.  However, a defendant's constitutional rights during community custody are "'subject to the infringements authorized by the [Sentencing Reform Act of 1981, chapter 9.94A RCW].'"  State v. Riles, 135 Wn.2d 326, 347, 957 P.2d 655 (1998) (quoting State v. Ross, 129 Wn.2d 279, 287, 916 P.2d 405 (1996)), overruled on other grounds by State v. Sanchez Valencia, 169 Wn.2d 782, 792, 239 P.3d 1059 (2010).  Because the restriction reasonably relates to Wright's crime, the court did not err by imposing it.

## Sentencing in Sting Sex Offense Cases With No Victims

Finally, Wright contends that the prosecutor and law enforcement are abusing their power to increase punishments.  He contends that law enforcement purposefully creates younger fictional victims to increase sentences and that law enforcement eliminates the ability to request a special sex offender sentencing alternative (SSOSA) under RCW 9.94A.670.

First, other task force cases do involve fictional children of different ages, which would result in lower sentences.  See, e.g., Solomon, 3 Wn. App. 2d at 899.  The task force's use of younger fictional children in some cases can be understood as targeted at finding people who are willing to perpetrate more serious crimes.

As to Wright's discussion of SSOSA, this law provides that a defendant can be eligible for a sentence alternative if they meet certain factors, including: "[t]he offender had an established relationship with, or connection to, the victim such that the sole connection with the victim was not the commission of the crime." RCW 9.94A.670(2)(e). This is the only factor that Wright did not meet, because there is no victim in this case. We have previously stated that in cases with no victims, SSOSA is not available. State v. Willhoite, 165 Wn. App. 911, 268 P.3d 994 (2012); State v. Landsiedel, 165 Wn. App. 886, 269 P.3d 347 (2012). Wright argued before the trial court that the legislature was considering cases involving actual victims when it passed this condition. While this may be the case, the law is nonetheless unambiguous. Wright's contention that the use of fictional victims is exploited to deny access to SSOSA does not acknowledge the fact that if there had been a real victim in this case, he still would not have qualified because he would not have an established relationship with her. The trial court did not err by denying Wright a SSOSA sentence.

We affirm.

_____

WE CONCUR:

_____       _____