[No. 58475-8-I. Division One. December 31, 2007.]

THE STATE OF WASHINGTON, *Respondent*, v. JUSTO FARIAS LOPEZ, *Appellant*.

344

*Justo Farias Lopez*, pro se.

*Eric J. Nielsen* and *Andrew P. Zinner* (of *Nielsen, Broman & Koch, PLLC*), for appellant.

*Daniel T. Satterberg, Interim Prosecuting Attorney*, and *William L. Doyle, Deputy*, for respondent.

¶1 PER CURIAM — Justo Lopez appeals his judgment and sentence, claiming for the first time on appeal that the trial court erred by not granting a mistrial, finding that his two assault counts did not constitute the same criminal conduct, and imposing psychological evaluation and treatment as a condition of community custody. He also contends there is insufficient evidence to support the jury's verdict finding him guilty on two counts of second degree kidnapping. Finally, he asserts in his statement of additional grounds that he was denied a fair trial because the prosecutor engaged in misconduct and solicited perjury, and his counsel was ineffective.

¶2 Lopez has failed to show that denying his mistrial motion prejudiced him. Nor did the State commit misconduct or solicit perjury, and Lopez has failed to show that his counsel made an error that prejudiced the outcome of his trial. Because the trial court did not abuse its discretion and the record contains overwhelming evidence to support the jury's verdict, we affirm the judgment and sentence. However, because there was no basis in the record for the trial court's ruling imposing the mental health evaluation, we reverse that portion of the sentence.

## FACTS

¶3 Justo Lopez married his wife, Yvonne, in 1997, and they had three children—Julio, Justo, and Jalina. About two years into their marriage, Lopez and Yvonne also took in Lopez's daughter, Jessica, whose mother was Lopez's ex-wife, Reyna Gonzales.

¶4 The record shows that Lopez was jealous, domineering, and vigilant about Yvonne's whereabouts during the course of the marriage. He also verbally and physically abused her. After an incident in 2004 which resulted in charges on two counts of assault, an arrest warrant was issued for Lopez. To avoid being arrested, Lopez moved Yvonne and his children from Washington to Miami, Florida. They lived there for about a year, during which time Emily Torres, a close friend of Jessica's, moved into their home with her parents' permission.

¶5 Lopez continued to abuse Yvonne in Miami. Because of that abuse and Yvonne's concerns about how Lopez was beginning to treat Jessica, Yvonne left for Washington with Jessica, Emily, and Jalina. Yvonne testified that she left their two boys with Lopez because he had told her earlier that he would kill her if she took the boys.

¶6 Lopez learned that Yvonne was staying with Reyna Gonzales in Federal Way. He took a bus back to Washington. At trial he testified that his intent was to ask Yvonne to return to Miami with him to reunite the family.

¶7 On the morning of July 28, 2005, Lopez and two male friends surprised Yvonne and the children at Gonzales's apartment. Around 10 a.m., Emily answered the door to find two men she had never seen. Lopez jumped out of the bushes and rushed into the apartment. He told Emily not to move. When Yvonne awoke to find Lopez in the room, she screamed, and before she could jump up from the couch, Lopez jumped over the coffee table, pushed her into the couch, and forcefully covered her mouth. She testified that he told her he would kill her if she did not stop screaming. He told Yvonne and Emily that he had the apartment surrounded and had been trailing them for three days. Lopez took Yvonne to the back bedroom to talk with her, and Emily heard shouting. A neighbor came by the apartment asking if everyone was okay. Although Jessica said "yes," she shook her head "no."

¶8 Yvonne testified that Lopez threatened to kill her and to then kill himself if she did not pack up the children and leave with him. A short time later, Lopez and his friends packed the family in two vehicles and left the apartment. Lopez told his daughter Jessica that she had betrayed him by leaving him and that she was "dead" to him. As punishment Lopez told Jessica she could not have contact with him and left her with her mother, Reyna. Lopez told Reyna and Jessica he was taking the others back to Miami.

¶9 Over the next few hours, the two vehicles carrying Lopez, Yvonne, the children, and the two males made several stops at homes and businesses. At one point, Lopez

split up Yvonne and Emily in different vehicles and left the two men behind. Lopez told Yvonne to follow him and warned her she was being followed. After they left the home of Joye McMullen, one of Lopez's acquaintances, McMullen called 911 and reported Lopez had kidnapped Yvonne and the two children. An "Amber Alert" was later issued.

¶10 As the two cars headed toward Fife, Yvonne noticed about 20 police cars surrounding the vehicle she was driving with Jalina as her passenger. The police stopped Yvonne, handcuffed her, but released her when they realized she was one of the victims. Lopez left the scene and drove Emily around, seeking her help in locating a man named Carlos, who Lopez believed was Yvonne's new boyfriend. Later that night, Lopez checked into a motel, where he and Emily stayed for the night. The next morning, an anonymous tip led police to find Lopez and Emily at an auto repair shop, where Lopez was arrested.

¶11 The State charged Lopez with three counts of second degree kidnapping—domestic violence, one count of felony harassment—domestic violence, and two counts of second degree assault—domestic violence. The jury found him guilty on all but the felony harassment charge. The jury also found that he committed one of the assault counts with a deadly weapon. At sentencing, the court imposed high end, concurrent standard range sentences and the mandatory deadly weapon enhancement.

## SUFFICIENCY OF THE EVIDENCE

¶12 Lopez argues that the State did not prove each element of two of the three second degree kidnapping counts. We disagree.

¶13 Evidence is sufficient to support a conviction if, viewing it in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.[1]

---

[1] *State v. Hendrickson*, 129 Wn.2d 61, 81, 917 P.2d 563 (1996).

¶14 A person commits kidnapping in the second degree if he or she intentionally abducts another person under circumstances not amounting to kidnapping in the first degree.[2,3] The statute defines "abduct" to mean "to restrain a person by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use deadly force."[4]

> "Restrain" means to restrict a person's movements without consent and without legal authority in a manner which interferes substantially with his liberty. Restraint is "without consent" if it is accomplished by (a) physical force, intimidation, or deception, or (b) any means including acquiescence of the victim, if he [or she] is a child less than sixteen years old . . . and if the parent, guardian, or other person or institution having lawful control or custody of [the child] has not acquiesced.[5]

A parent acts without legal authority within the meaning of RCW 9A.40.010(1) when he threatens to take a child from the custodial parent by force in order to coerce the custodial parent to do something against her will.[6]

¶15 The use or threat to use deadly force need not be directed toward the kidnapping victim. A person can kidnap a victim by directing the force or threat of deadly force against the victim's guardian.[7] Moreover, one can threaten

---

[2] RCW 9A.40.030(1).

[3] RCW 9A.40.020(1) provides:

A person is guilty of kidnapping in the first degree if he intentionally abducts another person with intent:

  (a) To hold him for ransom or reward, or as a shield or hostage; or
  (b) To facilitate commission of any felony or flight thereafter; or
  (c) To inflict bodily injury on him; or
  (d) To inflict extreme mental distress on him or a third person; or
  (e) To interfere with the performance of any governmental function.

[4] RCW 9A.40.010(2).

[5] RCW 9A.40.010(1).

[6] *State v. Tuitasi*, 46 Wn. App. 206, 209, 729 P.2d 75 (1986).

[7] *State v. Taylor*, 90 Wn. App. 312, 318, 950 P.2d 526 (1998).

or use deadly force during a kidnapping without using a deadly weapon.[8]

¶16 Lopez argues that he, as well as Yvonne, was Emily's guardian because Emily's parents gave them both permission to take Emily into their home in Miami, and Emily's mother extended that permission upon learning she moved to Washington. Thus, as her guardian, Lopez argues he had lawful control over Emily, and because he acquiesced in her move back to Miami, he did not restrain her.

¶17 Similarly, Lopez contends that a parent may not be convicted of second degree kidnapping of his own child, three year old Jalina, without evidence showing his parental rights have been limited by a court.[9] He contends the State failed to prove he restrained Jalina without consent because he, as a co-parent with equal control over her, acquiesced.

¶18 But the flaw in Lopez's argument is that he fails to recognize that a parent has equal rights to custody of his child only in the absence of misconduct.[10] In *State v. Tuitasi*, we addressed the question of whether a parent could be guilty of kidnapping his own child.[11] In that case, the defendant told his former wife that if she did not have sex with him, he would take their baby daughter away and she would never see the girl again.[12] We ruled that a parent who engages in misconduct affecting the child's well-being does not have an equal right to custody. We held that where a parent threatens to take the child with the sole intent to compel the other parent to do something against her will, the statutory right to equal custody does not give a parent legal authority to engage in such conduct.[13]

---

[8] *Id.* at 319.

[9] *See State v. La Caze*, 95 Wn.2d 760, 761, 630 P.2d 436 (1981).

[10] *See id.* at 763.

[11] 46 Wn. App. 206, 729 P.2d 75 (1986).

[12] *Id.* at 207.

[13] *Id.* at 209.

¶19 The record contains ample evidence supporting the jury's finding that Lopez's primary purpose in taking the children was to compel Yvonne to return with him. For example, Lopez instructed Yvonne to drive one vehicle with Jalina, and he drove in a separate vehicle with Emily. The State argued that he split up the children because he knew Yvonne felt responsible for Emily and would not flee without her. The State also argued that Lopez's decision to effectively disown his daughter, Jessica, and leave her in Washington with her biological mother rather than move her back to Miami with the others undercut his claim that Lopez's motivation was custodial. This evidence provides a sufficient basis for a jury to determine that, despite being one of Jalina's custodial parents and arguably one of Emily's guardians, Lopez restrained both children "without consent and without legal authority."

¶20 Furthermore, the record contained evidence that Lopez's conduct affected Jalina's well-being. For example, a police officer testified that when police pulled Yvonne over for driving a vehicle that was involved in an Amber Alert, Jalina was "extremely terrified." Jalina was crying, screaming, and hanging on to her mother when police approached the vehicle with guns drawn to handcuff Yvonne and investigate the situation. Lopez's conduct placed Yvonne and Jalina in this situation.

¶21 The record also contains evidence from which the jury could have found that Lopez restrained Emily "without consent and legal authority" by intimidating her into leaving. Emily testified that she was scared of Lopez. She said Lopez had a mean face and looked "very, very angry" when he arrived at the house with two unknown men who blocked the door. She testified that her stomach turned upside down when Lopez surprised them at Reyna's apartment. Emily also said she had seen Lopez push and yell at Yvonne before. After Lopez packed them up and drove them away from the apartment, she said she and Yvonne discussed trying to get away.

¶22 Finally, we also conclude that the record supports the jury's finding that Lopez abducted Emily and Jalina by using or threatening to use deadly force. The jury heard testimony that Lopez threatened to use deadly force against Yvonne by pointing a gun at her head and threatening to kill her if she and the girls refused to leave with him. The jury need only have believed that force was used against Yvonne, the children's parent and guardian, to convict.[14]

¶23 On all of these grounds, we conclude there was sufficient evidence in the record to support the jury's verdict on the kidnapping counts.

## SAME CRIMINAL CONDUCT

¶24 Lopez argues that the trial court abused its discretion by finding that count V, second degree assault with a deadly weapon, and count VI, second degree assault that recklessly inflicts substantial bodily harm, did not constitute the same criminal conduct.

¶25 We will not disturb a trial court's decision about same criminal conduct absent a clear abuse of discretion or a misapplication of the law.[15] A trial court abuses its discretion only when its decision is manifestly unreasonable or based on untenable grounds.[16]

¶26 In determining a defendant's offender score under the Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, two or more current offenses and prior offenses are presumed to count separately unless the trial court finds that the current offenses encompass the same criminal conduct.[17] Two crimes constitute the same criminal conduct only if the crimes (1) require the same criminal

---

[14] *See Taylor*, 90 Wn. App. at 318-19.

[15] *State v. Haddock*, 141 Wn.2d 103, 110, 3 P.3d 733 (2000).

[16] *State v. Finch*, 137 Wn.2d 792, 810, 975 P.2d 967, *cert. denied*, 528 U.S. 922 (1999).

[17] RCW 9.94A.589(1)(a).

intent, (2) are committed at the same time and place, *and* (3) involve the same victim.[18]

¶27 The record contained evidence that during an approximately four hour period, Lopez attacked Yvonne in the bedroom, where he choked her and attempted to beat information out of her by striking her head and ears. After she got away from him, she ran to the living room where Lopez again beat her, made her remove all her clothes, threatened her with rape, and went to the kitchen to get a knife. When he went for the knife, Yvonne tried to escape. Lopez returned and snatched her away from the door, pinning her to the floor with his weight. He held the knife to Yvonne's throat, making small cuts and threatening her with death if she did not tell him what he wanted to know. Lopez was charged with second degree assault that recklessly inflicts substantial bodily harm for striking Yvonne's head and ears, which perforated her eardrum. He was charged with second degree assault with a deadly weapon for threatening and cutting her with the knife.

¶28 Lopez argues the trial court erred in not making a finding of same criminal conduct because his motivation—to satisfy his suspicion Yvonne was cheating on him—did not change between the crimes. He argues that each crime was intimately related to the other, each was still in progress during the commission of the other, and each furthered the purpose of the other.

¶29 We find no abuse of discretion. The trial court correctly applied the law. In its oral ruling, the court expressly considered *State v. Grantham*[19] and compared it to this case. The court noted that the mens rea requirements are different for assault with a deadly weapon and assaulting another thereby recklessly inflicting substantial bodily harm. Evidence showed that Lopez first attempted to

---

[18] *Id.*

[19] 84 Wn. App. 854, 932 P.2d 657 (1997) (holding that the defendant formed new criminal intent between two separate rapes accomplished by two different methods where they occurred in the same place, within a relatively close time period, and against the same victim).

beat information out of Yvonne and after she escaped, he resorted to threatening to kill her with a kitchen knife. It was within the trial court's discretion to determine that Lopez's intent had changed between incidents. In addition, as in *Grantham*, the two crimes were not the same course of conduct. One kind of beating ended before the knife attack occurred in a different room. The record supports the court's decision, and we affirm the trial court's ruling.

## CRIMINAL RULE 6.11(a)

¶30 Lopez argues that CrR 6.11(a) entitles him to a new trial because he objected at trial to the reassignment of his case to Judge Bruce W. Hilyer after Judge Andrea A. Darvas had heard pretrial testimony and made factual and legal findings.

■■ ¶31 However, the remedy he seeks is not the remedy available to him under CrR 6.11(a) because a defendant is not entitled to the judge of his choice once a mistrial is declared. Lopez cites no authority for the proposition that after a mistrial, a case must be assigned to the same judge who heard pretrial motions and testimony. Because Lopez had no right to have the same judge who heard his pretrial motions preside over the trial, the case could properly have been reassigned to a judge who, like Judge Hilyer, had not heard the pretrial motions or testimony. The failure to grant a mistrial did not prejudice Lopez, and a new trial is not required.

## PSYCHIATRIC EVALUATION

¶32 Both parties agree that the trial court erred when it imposed as a condition of community custody that Lopez obtain a psychiatric evaluation and follow all treatment recommendations.

■ ¶33 RCW 9.94A.505(9) authorizes a trial court to order a mental health evaluation as a condition of community custody when specific procedures are followed. A trial

court errs by ordering mental health treatment as a condition of community custody where the court has not obtained or considered a presentence report or mental status evaluation, and has not made findings that the defendant was a person whose mental illness contributed to his crimes.[20]

¶34 Here, the record does not satisfy the requirements of RCW 9.94A.505(9). The State concedes that the trial court did not make the required findings or obtain a presentence report or mental status evaluation. We must therefore remand to the trial court to strike the condition requiring Lopez to undergo psychiatric evaluation and treatment.

## STATEMENT OF ADDITIONAL GROUNDS

¶35 Lopez filed pro se a statement of additional grounds, raising several additional issues for review. His arguments are without merit.

¶36 Lopez argues that the State committed misconduct by repeatedly referring to him as a "liar" in closing arguments, denying him a fair trial. The record does not support Lopez's claim that the State called him a "liar." Rather, the State merely pointed out that Lopez's changing story throughout the trial demonstrated that he told "lies." Lopez offers no authority that the State's arguments were improper here. Based on the record, it was reasonable for the State to draw inferences that Lopez was not being truthful because of the inconsistencies in his testimony. Even if the comments had been improper, Lopez did not object and has not shown that a curative instruction would not have effectively remedied any resulting prejudice.[21]

¶37 Next, he argues the trial court erred by admitting testimony that Lopez had people watching Gonzales's apartment and allowing the State to highlight this testimony in closing argument. Lopez asserts the State improperly offered evidence of his ties to organized crime, which

---

[20] *State v. Jones*, 118 Wn. App. 199, 209, 76 P.3d 258 (2003).

[21] *See State v. Belgarde*, 110 Wn.2d 504, 507, 755 P.2d 174 (1988).

should have been excluded under ER 404(b). Evidence about Lopez's criminal connections was specifically addressed in the motions in limine. After extensive pretrial hearings, the trial court made findings that the probative value of the evidence was not outweighed by the prejudicial nature of the evidence and admitted evidence of his ties to the drug dealing community, including his ability to summon individuals to follow his orders and commit violent acts for him. It admitted this evidence for the proper purpose of showing Yvonne's state of mind and the context of their relationship. The trial court did not abuse its discretion in making this finding, and the testimony offered did not violate ER 404(b) because it was offered to prove things other than Lopez's propensity to commit the crimes at issue.

¶38 Lopez next argues that the prosecution knowingly used false evidence or perjured testimony, thereby violating his right to due process. He cites to places in the record which he contends contain perjured testimony the State allowed to go uncorrected and affected the judgment of the jury. Although various individuals, including Lopez, testified inconsistently and some testimony may have contradicted pretrial interviews and police reports, he has not shown that the State knew any testimony it solicited was going to be false. Thus, his argument fails.

¶39 Finally, Lopez argues that he was denied effective assistance of counsel when defense counsel failed to request a jury instruction on the lesser included offense of unlawful display of a weapon. But Lopez was not entitled to a lesser included offense instruction because the evidence does not support the inference that he committed only that crime.[22] The record contains overwhelming evidence that Lopez assaulted Yvonne with a deadly weapon during the 2004 incident and does not support a conclusion that he merely displayed a weapon. Thus, his claim of ineffective assistance fails.

---

[22] *See State v. Fernandez-Medina,* 141 Wn.2d 448, 455, 461, 6 P.3d 1150 (2000).

¶40 We affirm the judgment and sentence in part, reverse in part, and remand for further proceedings.

Review denied at 164 Wn.2d 1012 (2008).