# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57114-5-II |
| Respondent/Cross Appellant, | |
| v. | |
| BENJAMIN ADAM STOTT, | ORDER GRANTING MOTION TO PUBLISH |
| Appellant/Cross Respondent. | |

Respondent, State of Washington, filed a motion to publish the Court's unpublished opinion filed in this matter on December 19, 2023. After consideration, the court grants the motion. It is now

**ORDERED** that the opinion will be published.

**PANEL:** Jj. Glasgow, Cruser, Che

**FOR THE COURT:**

_____
CRUSER, J.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 57114-5-II |
| Respondent/Cross Appellant, | |
| v. | |
| BENJAMIN ADAM STOTT, | UNPUBLISHED OPINION |
| Appellant/Cross Respondent. | |

CRUSER, A.C.J. — Benjamin Stott appeals his convictions of attempted second degree rape of a child, attempted commercial sexual abuse of a minor, and communication with a minor for immoral purposes. The convictions stem from Stott's communications with an undercover Washington State Patrol (WSP) officer who was posing as a fictional 13-year-old girl ("Kaci") as part of an online sting operation which aimed to find and arrest adults interested in sex with children. Stott was arrested and charged upon leaving his home to meet up with "Kaci." Stott moved to dismiss the charges against him, claiming that he was denied due process as a result of outrageous government conduct stemming from the sting operation. The trial court, after applying the five factors outlined in *State v. Lively*, 130 Wn.2d 1, 19, 921 P.2d 1035 (1996), denied the motion. Stott was convicted following a jury trial and was sentenced to 75.25 months based on an offender score of zero.

No. 57114-5-II

Stott appeals the denial of his motion to dismiss. The State cross appeals Stott's sentence, asserting that the trial court erred in concluding that Stott's three convictions constituted the same criminal conduct. We affirm Stott's conviction because the trial court did not abuse its discretion in denying his motion to dismiss. However, we remand for resentencing because Stott's crimes do not constitute the same criminal conduct.

FACTS

I. UNDERLYING INCIDENT

In July 2018, WSP conducted a "Net Nanny" operation, aiming to find and arrest adults interested in having sex with children. As part of the operation, WSP advertised on Doublelist, which is an online bulletin board.[1]

A WSP sergeant posted an ad on Doublelist, posing as a fictitious 13-year-old girl named "Kaci." Clerk's Papers (CP) at 435. The headline of the ad read " 'Nice girl ready to play ;) (Puyallup),' " and the body of the ad read, " 'younger than u think. I'm here for the weekend HMU [(hit me up)] if you want to chat, open to everything and would like [someone] older to teach me new stuff.' "[2] *Id.* at 463-64.

Benjamin Stott responded to "Kaci's" ad on July 26, 2018, saying " 'how young? I'm totally down to chat, or play, or anything in between - could even uber you to my place up in seattle tonight. . . ;)' " *Id.* at 464. "Kaci" replied saying, " 'Im looking for a older guy to teach me cool

---

[1] Doublelist is similar to Craigslist but it specifically caters to intimate and romantic relationships. The terms and conditions on Doublelist state that users must be age 18 or older, but the site does not require users to verify their age.

[2] Misspellings, punctuation, and capitalization here and in communications hereafter are in the original.

stuff. I'll be honest I'm 13 so if that's to yung [sic] i understand. If not HMU and we can chat.' " *Id.* Stott responded: " 'I'm down to chat. Don't worry too much - I'm 25 an dI'm sure I can teach you a thing or two. :) Got any kind of day or time in mind?' " *Id.* "Kaci" and Stott moved the conversation to text message, and proceeded to exchange over 900 text messages over the course of the following five days.

During the course of their exchange, "Kaci" reminded Stott of her age multiple times. *Id.* at 437 (" 'im 13 not stupid' "), 442 (" 'im [f***ing] 13!' "), 444 (" 'im 13 years old in a house by myself. it can be scary for me' "), 455 (" 'im only 13 remember. i don't have a bank accoutn' "). Stott explicitly acknowledged "Kaci's" age multiple times. *Id.* at 444 (" 'You're 13 and it's going to be after 1am. Chances are you won't be able to keep your eyes open even though you want to!' "), 445 (" 'I'm not the cops . . . But you're 13. You know how much trouble I can get in here, right?' "). Stott also expressed suspicion that he was being set up. *Id.* at 445 (" 'You have to understand, you're saying you're 13 and on the internet. How do I know this isn't a set up?' ").

Stott was the first to discuss sex after "Kaci" typed " 'can u come to puyallup and play? ;)' " *Id.* at 435. Stott asked about "Kaci's" experience, and "Kaci" replied that she had " 'a little but not much.' " *Id.* "Kaci" asked Stott " 'what have u done?' " *Id.* Stott answered, " 'All sorts of things. Vanilla sex, teaching anal, sometimes my play partners like ropes or impact, giving up control, public play. You name it and I might have tried it.' " *Id.* Stott engaged in extensive conversation with "Kaci" around whether he would need to wear a condom, and potential payment. *Id.* at 436 (" 'It's far more fun without a condom, . . . You can definitely earn some favours. . . . I'd happily give you $20 each if both of you taste and one of you swallows my cum . . I'd offer

$50 for anal.' "). The two also went back and forth on meeting locations, with Stott eventually convincing "Kaci" to meet him in Seattle.

While Stott expressed some concern that he was being " 'catfish[ed]' " and that this was a setup, he did not try to end the communication. *Id.* at 439, (" 'I'm not coming unless I know you and your friend are both real.' "), 440 (" 'You first, since you're the catfish.' "), 445 (" 'How do I know this isn't a set up?' "). Both Stott and "Kaci" reinitiated the conversation after breaks in communication. *Id.* at 437 ("Kaci" messaged Stott on the morning of July 27, after the two signed off the night before), 438 ("Kaci" messaged " 'ru flaking on me?' " after not hearing from Stott for a few hours), 447 (Stott messaged " 'Still there? If you're worried about something in particular, want to call me in 10 minutes?' "), 449 (Stott messaged " 'Still there? I'm leaving in 5m.' ").

Both Stott and "Kaci" were persistent in attempting to meet in person. On a few occasions, "Kaci" tried to persuade Stott by using pleas of sympathy. *Id.* at 446 (" 'i don't have any food in the house. . . . can u come here an bring me dinner?' "), 450 (" 'im scared so can u hurry?' "). "Kaci" also told Stott she would find someone else to meet. *Id.* at 438 (" 'u better not let me down . . . im going to find someone else for us if u don't answer' "), 439 (" 'ur being a dick . . . were going to find someone else' "), 441 (" 'ur lame' "). Stott used very sexual language in exchanges with "Kaci." *Id.* at 442 (" 'I would pin you down, choke you, spank you, [f**k] you raw and without lube, cum inside you repeatedly. . . . If you kick me in the balls I'm going to tie you up, hurt you, and pump so much cum into you you overflow' "), 454 (" 'Maybe I should uber you here. I need a cum receptacle for the night.' ").

When Stott first responded to the ad, he offered to send an Uber to pick "Kaci" up and take her to his home in Seattle that night. He made this offer repeatedly throughout their exchange. *Id.* at 440 (Stott messaged " 'I'll pay for your uber to and from here' " on July 28), 442 (the next day he made the same offer " 'If you get an uber here I'll cover the costs.' "). On July 30, Stott drove from Seattle to Puyallup to meet up with "Kaci" who requested that they meet at the local 7-Eleven. When that attempt to meet in person failed, Stott again offered to send an Uber to pick "Kaci" up.[3] *Id.* at 451 (" 'I'm halfway back home. Uber from where you are to my place; I'll pay for it and you can stay the night.' "). Eventually, "Kaci" agreed and Stott did send an Uber to pick her up that night.

On July 31, "Kaci" told Stott that her friend ordered her an Uber to Seattle. Stott agreed to meet "Kaci" at a pizza parlor near his home. Officers arrested Stott "as he was observed leaving his home and walking in the direction of the pizza parlor." *Id.* at 711.

## II. PROCEDURAL HISTORY

Stott was arrested and charged with attempted second degree rape of a child, attempted commercial sexual abuse of a minor, and communication with a minor for immoral purposes. Stott moved to dismiss the charges against him, arguing that he was denied due process as a result of outrageous government conduct. Stott contended that the government, motivated by an intent to prosecute rather than an intent to protect the public, instigated the crimes, used pleas of sympathy to convince Stott to engage, controlled all criminal activity, and acted in a way that was repugnant to a sense of justice. The State responded that the police actions were motivated by an intent to

---

[3] On the day that Stott drove to Puyallup to meet up with "Kaci," the WSP team was not prepared to arrest him because they needed to dedicate resources to a separate high-priority arrest in the area.

protect children, the conduct merely infiltrated ongoing criminal activity which the government did not control, and Stott was not truly reluctant to commit the crimes.

At the hearing, the trial court was presented with the facts outlined above. After hearing oral argument from the parties and considering the *Lively*[4] factors, the court denied the motion to dismiss, reasoning that "dismissal for government misconduct is to only occur on the most egregious circumstances," and the behaviors of the State, "taken in their entirety, do not rise to that level." Verbatim Rep. of Proc. (VRP) (Apr. 28, 2022) at 10. In its written ruling, the trial court discussed the five *Lively* factors, finding that (1) WSP did not instigate the criminal activity; (2) "[a]ny reluctance by the defendant to commit a crime was not overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation;" (3) Stott controlled the criminal activity; (4) the motive of the police was to protect the public; and (5) "the government's conduct itself does not amount to criminal activity repugnant to a sense of justice." CP at 711-13.

III. SENTENCE & OFFENDER SCORE

A jury found Stott guilty of attempted rape of a child in the second degree, attempted commercial sexual abuse of a minor, and communication with a minor for immoral purposes. At sentencing, Stott argued that his offender score should be zero because all of his "offenses arose out of the same events, involved the same intent, and involved the same victim." *Id.* at 635. The State argued that Stott's score should be six because Stott's offenses did not constitute the same criminal conduct, as each involved a different intent.

---

[4] 130 Wn.2d at 19 (outlining five factors for courts to consider in outrageous government misconduct claims).

The court found that Stott's three crimes were all "part of one common scheme" and encompassed the same criminal conduct. VRP (July 1, 2022) at 51. Accordingly, the trial court set Stott's offender score as zero. The court explained that Stott had a single objective intent, "to have sex with a 13-year-old," and went on to find that he was not "paying attention to the different elements of the different crimes he may have been committing when that happened." *Id*.

With an offender score of zero, the high end of the standard sentencing range for Stott was 99.75 months and the low end was 75.25 months. Stott received a total sentence of 75.25 months.

Stott now appeals his conviction and the State cross appeals the calculation of Stott's offender score.

## ANALYSIS

### I. STANDARD OF REVIEW

Stott argues that this court should apply a de novo standard of review to the court's ruling on his motion to dismiss for outrageous government conduct. We disagree and review the decision for abuse of discretion.

### A. Legal Principles

Appellate courts review a trial court's decision whether to dismiss charges based on outrageous government conduct for abuse of discretion. *State v. Athan*, 160 Wn.2d 354, 375-76, 158 P.3d 27 (2007). *See also State v. Glant*, 13 Wn. App. 2d 356, 369, 465 P.3d 382 (2020) ("We review whether the trial court erred in denying a motion to dismiss based on outrageous government misconduct for an abuse of discretion."). Finding an abuse of discretion "requires the trial court's decision to be manifestly unreasonable or based on untenable grounds or untenable

reasons." *Athan*, 160 Wn.2d at 375-76. When a trial court adopts a view that no reasonable person would take, then it has abused its discretion. *Glant*, 13 Wn. App. 2d at 369.

## B. Application

Stott argues that this court should apply a de novo standard of review. He contends that because the vast majority of the government's conduct was recorded, and is therefore not in question, "the trial court's decision did not rest on disputed facts or credibility determinations." Br. of Appellant at 27. In support of his argument for de novo review, Stott includes a quote from *Lively*, which states that " '[w]hether the State has engaged in outrageous conduct is a matter of law, not a question for the jury.' " Br. of Appellant at 26 n.43 (quoting 130 Wn.2d at 19). Here, the *Lively* court was not discussing appropriate standards for appellate review. The *Lively* court was explaining that even though the defendant did not raise the issue of outrageous government conduct in the superior court, she was permitted to raise the issue on appeal because it concerned a constitutional error. *Lively*, 130 Wn.2d at 19.

Pursuant to our supreme court's holding in *Athan*, the standard of review is abuse of discretion. 160 Wn.2d at 375-76.

## II. OUTRAGEOUS GOVERNMENT CONDUCT

Stott contends that he was denied due process as a result of outrageous government conduct and that that the superior court erred in denying his motion to dismiss. He asserts that an analysis of the five *Lively* factors warrants a finding of outrageous government conduct. The State responds that "Stott did not establish outrageous government conduct as the deception used by the [Net Nanny operation] in its efforts to protect children from those predisposed to engage in sexual

conduct with them did not exceed that tolerated in undercover operations." Br. or Resp't at 25. We agree with the State.

A. Legal Principles

Outrageous government conduct will be shown when the actions of law enforcement officers are " 'so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction' . . . For the police conduct to violate due process, the conduct must shock the universal sense of fairness." *Lively*, 130 Wn.2d at 19 (quoting *United States v. Russell*, 411 U.S. 423, 431-32, 93 S. Ct. 1637, 36 L. Ed. 2d 366 (1973)).

Whether government conduct constitutes a due process violation should be evaluated based on the " 'totality of the circumstances.' " *Id.* at 21 (quoting *United States v. Tobias*, 662 F.2d 381, 387 (5th Cir. 1981)). Our supreme court in *Lively* outlined five factors for courts to consider in determining whether outrageous government conduct occurred: (1) "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity;" (2) "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation;" (3) "whether the government controls the criminal activity or simply allows for the criminal activity to occur;" (4) "whether the police motive was to prevent crime or protect the public;" and (5) "whether the government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.' " *Id.* at 22 (quoting *People v. Isaacson*, 44 N.Y.2d 511, 521, 378 N.E.2d 78, 406 N.Y.S.2d 714 (1978)).

B. Application

Stott argues that the trial court abused its discretion in concluding that the *Lively* factors did not weigh in favor of finding that the government's conduct here was so outrageous that it

violated Stott's right to due process. The trial court analyzed each of the five *Lively* factors in determining that the totality of the circumstances did not warrant a finding of outrageous government conduct. In examining the trial court's application of these factors, we hold that the trial court did not abuse its discretion in denying Stott's motion.

### 1. *Whether the Police Instigated the Crime*

This factor asks "whether the police conduct instigated a crime or merely infiltrated ongoing criminal activity." *Id.*

Stott relies primarily on *Solomon*, in which an undercover officer posted an ad on Craigslist stating that she was " 'a young female looking for sex with either a man or woman." *State v. Solomon*, 3 Wn. App. 2d 895, 898, 419 P.3d 436 (2018). Solomon responded to the ad asking whether she was " '[o]nly interested in [a] woman.' " *Id*. After not hearing back for a few hours, Solomon sent another message saying " '[m]ust be I won't bug [you] anymore.' " *Id*. Four days later, the undercover detective responded to Solomon's messages, indicating interest in a sexual encounter with him. *Id*. at 899. The detective then told Solomon that she was 14 years old. Upon learning that she was a minor, Solomon immediately and expressly rejected the detective's proposition. *Id.* The detective continued to send explicit and lewd messages after Solomon rejected her, trying to entice him into agreeing to have sex with her. *Id*. at 900. Solomon and the detective messaged each other back and forth for four days, during which Solomon rejected the detective's solicitations seven times. *Id*. at 898. The trial court in *Solomon* found that the government instigated the crime by both posting the advertisement and "by initially messaging Solomon even though he had indicated that he would not again contact the individual who had posted the advertisement." *Id.* at 912.

10

Here, the trial court, in its oral ruling, emphasized that the initial advertisement did not specifically target Stott, and that Stott initiated the exchange by responding to the ad. The trial court found that the State did not instigate the crime, but merely infiltrated potential criminal activity. Stott continued to text "Kaci" after he learned that she was underage. Unlike Solomon, Stott did not at any time seek to withdraw from the exchange, even when he expressed some concern that he was possibly being set up. Moreover, it was Stott who introduced sexually explicit language to the conversation. The trial court therefore did not abuse its discretion in weighing this factor against Stott.

### 2. Overcoming Reluctance by Persistent Solicitation

The second *Lively* factor asks "whether the defendant's reluctance to commit a crime was overcome by pleas of sympathy, promises of excessive profits, or persistent solicitation." *Lively*, 130 Wn.2d at 22. The court weighed this factor against Stott, finding that "Kaci's" pleas for sympathy and plays to Stott's emotions did not influence Stott's behavior. Indeed, Stott had already attempted to meet up with "Kaci" before "Kaci's" entreaties began.

Stott, however, argues that the text messages sent by "Kaci" involved repeated and relentless pleas, threats, and challenges. He highlights the text messages in which "Kaci" claimed to be lost, scared, and hungry. Br. of Appellant at 33-35 (quoting Ex. 4, at 24 (" 'i don't have any food in the house .   . can u come here an bring me dinner?' "(first alteration in original) and citing Ex. 4, at 33 (" 'im scared so can u hurry?' ")). Stott also highlights the messages where "Kaci" supposedly threatens Stott. *Id.* at 33-34 (quoting Ex. 4, at 8 (" 'u better not let me down . . . im

11

going to find someone else for us if u dont answer' "), 10 (" 'ur being a dick . . . were going to find someone else' "), 13 (" 'ur lame' ")).[5]

Stott compares this to the officers in *Solomon*, saying that the officers "repeatedly and consistently went back to Mr. Stott to see if they could reset the hook." *Id*. at 33. He argues that "Kaci" "employed various escalating tactics, attempting to persuade [him] . . . making explicit and titillating offers," and says that "Kaci's" efforts and attempts "support[ ] the conclusion that Mr. Stott's reluctance to commit a crime was overcome by repeated pleas of sympathy and extremely persistent solicitation." *Id.* at 33, 35.

In *Solomon*, the trial court emphasized that Solomon's reluctance was made clear by the seven attempts he made to end communication with the detective. *Solomon*, 3 Wn. App.2d at 913-14. The facts in *Solomon* bear no resemblance to the exchange between Stott and "Kaci." Other than brief mentions of his fear of being "catfished," Stott willingly and repeatedly engaged "Kaci" and made no attempts to discontinue the interaction. Stott did not reject "Kaci" after being told that he was interacting with a minor, as Solomon did. Moreover, Stott did not make similar affirmative attempts to end the conversation. Furthermore, Stott took affirmative steps to meet "Kaci" in person, such as driving down to Puyallup to meet her at the 7-Eleven and offering to order and pay for an Uber to bring her to Seattle on multiple occasions.

---

[5] On appeal, Stott relies on different portions of the text messages than the ones he relied on at the trial court for his assertion that Kaci threatened him. *Compare* VRP (Apr. 27, 2022), *with* Br. of Appellant at 33-34. As it related to the comments he relied on below, the trial court found that "Kaci" did not threaten Stott and that the totality of the conversation, against the backdrop of Stott having said that he was into "rope play, dominance and control," showed that Stott did not feel threatened by "Kaci," particularly since he believed she was a 13-year-old child. VRP (Apr. 28, 2022) at 8. We do not address the comments he relied on below because he does not rely on them on appeal.

The trial court did not abuse its discretion in weighing this factor against Stott.

*3. Control of Criminal Activity*

The third *Lively* factor asks "whether the government controls the criminal activity or simply allows for the criminal activity to occur." *Lively*, 130 Wn.2d at 22. Stott again relies on *Solomon* for his contention that the trial court abused its discretion in finding that this factor weighed against Stott. In *Solomon*, the trial court found that the undercover detective "controlled the criminal conduct both by initiating the interaction between her and Solomon and by stringing him along over the course of the four days of exchanges." *Solomon*, 3 Wn. App. 2d at 914.

*Solomon* is not helpful to Stott. The trial court concluded that Stott "was in the driver's seat" and properly relied on the fact Stott was the one who told "Kaci" what acts he wanted her to perform and negotiated how much he was willing to pay. VRP (Apr. 28, 2022) at 9. Furthermore, Stott brought up the topics of condoms, lubricant, providing Plan B in lieu of wearing a condom, payment, Ubers, and a meeting location. The trial court did not abuse its discretion.

*4. The Government's Motive*

The fourth factor asks "whether the police motive was to prevent crime or protect the public." *Lively*, 130 Wn.2d at 22. Stott argued to the trial court that government's motive was not to prevent crime against children. Rather, Stott contended that the government's motive was to entice Stott, who "had not shown himself to be any danger to the public" until the point that he showed his intent to act on his discussions with "Kaci," to commit a crime. CP at 430. The trial court disagreed, finding that the "primary purpose of the 'net nanny' operations is to catch individuals that would be committing crimes against children." *Id.* at 713.

Stott has not shown an abuse of discretion on the part of the trial court. In his opening brief Stott argues that law enforcement should direct its resources exclusively at perpetrators who are actively engaged in trafficking children, rather than "creating crimes to prosecute." Br. of Appellant at 39. Stott's subjective and self-serving view about how law enforcement should expend its resources is not germane to this question. The trial court found that the "Net Nanny" operation is designed to catch would-be sexual abusers before they have a chance to sexually assault an actual child. Stott's suggestion that he was not otherwise inclined to engage in sex with a child and only acquired that inclination in response to "Kaci's" enticements is wholly belied by the evidence that was presented to the trial court. The trial court did not abuse its discretion.

*5. Repugnant to Sense of Justice*

The final factor to consider is "whether the government conduct itself amounted to criminal activity or conduct 'repugnant to a sense of justice.' " *Lively*, 130 Wn.2d at 22 (quoting *Isaacson*, 44 N.Y.2d at 521). Stott argued to the trial court that the government's conduct was repugnant because "Kaci" used lewd and vulgar language.[6]

Stott again relies on *Solomon*, in which the trial court found that the government's use of explicit and lewd language during the undercover operation was repugnant to a sense of justice. *Solomon*, 3 Wn. App. 2d at 914. Stott's repeated reliance on *Solomon* overlooks that on appeal,

---

[6] Stott also argued below that the conduct was repugnant because "Kaci" threatened him. On appeal, however, he does not rely on the comments that he relied on below for this claim, and he only mentions an alleged "threat" on appeal for his argument that he was unduly pressured into engaging in criminal activity. Moreover, the trial court found that Stott was not threatened and that he was an active participant in the back and forth where these "threats" were allegedly leveled. CP at 712. The trial court also found that Stott could not have taken these remarks by "Kaci" as serious expressions of intent to harm, particularly given Stott's stated interest in dominance, control, and "rope play," and the fact that Stott believed that "Kaci" was a 13-year-old girl. VRP (Apr. 28, 2022) at 8. This was not an abuse of the trial court's discretion.

the question in *Solomon* was merely whether the trial court had abused its considerable discretion in dismissing the case by adopting "a view that no reasonable judge would take." *Id.* at 916. *Solomon* did not hold, as a matter of law, that the use of vulgar, explicit, or lewd language in undercover "Net Nanny" operations is repugnant to a sense of justice. Here, the trial court determined that Stott was just as lewd and vulgar in his language as "Kaci," and the evidence presented to the court for its consideration on the motion supports that determination. The trial court did not abuse its discretion in weighing this factor against Stott.

We conclude that the trial court did not abuse its discretion in denying Stott's motion to dismiss for outrageous government conduct. Accordingly, we affirm Stott's conviction.

## III. SAME CRIMINAL CONDUCT

In its cross appeal, the State argues that the trial court erred in finding that Stott's three convictions involve the same criminal conduct, counting them as a single point rather than scoring them separately. At sentencing, the trial court opined that Stott's overarching purpose in the commission of his crimes was "to have sex with a 13-year-old," and therefore his crimes were part of "one common scheme, so his offender score will be zero." VRP (July 1, 2022) at 51.

The State asserts that the trial court applied the wrong analysis in its same criminal conduct determination, and should have considered only the objective intent elements of each crime as set forth in the statute describing the crime rather than the defendant's subjective intent. Applying an objective intent analysis, the State contends that the trial court should have deemed Stott's three crimes to be separate criminal conduct and scored them accordingly.

Stott responds that the trial court correctly applied the law in reaching the conclusion that his convictions constituted the same criminal conduct because his subjective intent throughout the

criminal activity remained the same. Because *State v. Westwood*, ___ Wn.3d ___, 534 P.3d 1162 (2023), is dispositive of this issue, we agree with the State.

A. Legal Principles

Generally, multiple current offenses are "presumed to count separately unless the trial court finds that the current offenses encompass same criminal conduct." *State v. Lopez*, 142 Wn. App. 341, 351, 174 P.3d 1216 (2007). However, if a defendant's crimes constitute the same criminal conduct, then "those current offenses shall be counted as one crime." RCW 9.94A.589(l)(a). The statute defines " 'same criminal conduct" to mean "two or more crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id.* We review determinations of same criminal conduct for abuse of discretion or misapplication of law. *State v. Aldana Graciano*, 176 Wn.2d 531, 533, 295 P.3d 219 (2013). The defendant bears the burden of establishing that current offenses constitute the same criminal conduct. *Id.* at 539.

In *State v. Chenoweth*, 185 Wn.2d 218, 219, 370 P.3d 6 (2016), the defendant argued that, when based on a single act, the two crimes of rape of a child and incest constitute the same criminal conduct. Our supreme court held that those two crimes are not the same criminal conduct within the meaning of RCW 9.94A.589(l)(a). The court explained that a "straightforward analysis of the statutory criminal intent for rape of a child and incest identifies separate and distinct 'objective intent,' " concluding that these two crimes "are not the same criminal conduct for purposes of sentencing." *Id.* at 224-25.

This court applied *Chenoweth's* analysis in *State v. Johnson*, 12 Wn. App. 2d 201, 213, 460 P.3d 1091 (2020). There, we held that the defendant's convictions for attempted rape of a child in the second degree, attempted commercial sexual abuse of a minor, and communicating

with a minor for immoral purposes—the same crimes for which Stott was convicted—did not encompass the same criminal conduct because they involved different statutory intents. *Id.* Some courts, however, viewed *Chenoweth* as a departure from *State v. Dunaway*, 109 Wn.2d 207, 743 P.2d 1237 (1987), which emphasized looking to whether the defendant's objective intent changed from one crime to the next. *See, e.g.*, *State v. Hatt*, 11 Wn. App. 2d 113, 143, 452 P.3d 577 (2019) (declining to apply *Chenoweth*'s statutory intent framework due to apparent conflict with *Dunaway*).

Recently, our supreme court reaffirmed *Chenoweth* and *Dunaway*, and explained the proper analysis for "same criminal intent." In *Westwood*, 534 P.3d at 1167, the court explained that:

> In determining "same criminal conduct," it makes sense to look at the statutory definitions of the crimes to determine the objective intent, and indeed, this has consistently been the starting point for our cases. When read properly, *Dunaway* relies on the statutory definitions of "intent" for each of the crimes to determine objective intent. This is consistent with *Chenoweth*. If the objective intent for the offenses were the same or similar, courts can then look at whether the crimes furthered each other and were part of the same scheme or plan. If the actions occurred in close proximity, and the nature of the crime did not change significantly throughout, the offenses may be considered the same criminal conduct for sentencing purposes. This analysis prevents courts from speculating about the defendant's proposed subjective purpose and instead looks solely at the objective intent and whether the crimes were closely related enough to justify a finding of same criminal conduct.

The court went on to explain that RCW 9.94A.589(1)(a) "requires that we apply the objective intent analysis, little different than the objective analysis outlined in *Dunaway*." *Id.* at 1168. The court stated that under a proper reading of *Chenoweth* and *Dunaway*, "this means that we look to the statutory intent of the crimes as the starting point in determining whether the crimes should be treated as one." *Id.* "If the objective intent for the offenses were the same or similar,

courts can then look at whether the crimes furthered each other and were part of the same scheme or plan." *Id.* at 1167.

In *Johnson*, this court applied *Chenoweth*'s statutory intent framework to determine whether trial counsel had performed deficiently in failing to argue at sentencing that the defendant's three convictions should be considered part of the same criminal conduct for sentencing purposes. We held that

> Johnson's three crimes did not involve the same criminal intent. The intent for second degree rape of a child is the intent to have sexual intercourse, whereas the intent for commercial sexual abuse of a minor is the intent to exchange something of value for sexual conduct. RCW 9A.44.076; RCW 9.68A.100. Further, the intent required for communication with a minor for immoral purposes requires a different intent than the other two crimes; the intent to communicate with a minor with a predatory purpose of sexualizing the minor. Accordingly, we hold that these three crimes require different criminal intent. An argument for same criminal conduct would have failed. As a result, we hold that Johnson's trial counsel did not provide ineffective assistance because Johnson cannot show prejudice.

*Johnson*, 12 Wn. App. 2d at 213. In *Westwood*, our supreme court acknowledged *Johnson* and the court of appeals cases that disagreed with it, and *Westwood's* analysis of *Chenoweth* and *Dunaway* is consistent with the manner in which the *Johnson* court applied the same criminal conduct test. *See Westwood*, 534 P.3d at 1164, 1166-67.

B. Application

The State argues that the "sentencing court erred in this case by only looking to Stott's subjective intent," and failing to follow "[e]xisting precedent [which establishes] that Stott's three crimes of conviction all involve separate objective intents." Br. of Resp't at 14.

Stott responds that "[u]nder the framework dictated by *Dunaway* and [its] progeny, the trial court's finding that Mr. Stott's convictions constituted same criminal conduct was not an abuse of discretion." Reply Br. of Appellant at 18. He argues that the "leading same criminal conduct case

18

has been *Dunaway*" as of 1987. *Id*. at 19. As such, he contends, the State's arguments regarding Stott's offender score fail because they rely on *Chenoweth* and *Johnson*, which in Stott's view depart from *Dunaway*.

The briefing in this case was completed before our supreme court issued its decision in *Westwood*, and the State filed a statement of additional authorities, pursuant to RAP 10.8, on the day *Westwood* was issued. Stott did not file a response to the State's pleading.

We agree with the State. Under *Johnson*, which correctly applied the same criminal conduct analysis to the three crimes at issue in this case, Stott's crimes do not encompass the same criminal conduct. Stott's objective intent as to each of these three crimes was different, just as in *Johnson*. It was particularly specious for the trial court to hold that Stott's intent in seeking to pay "Kaci" in exchange for sex was the same as his intent in attempting to rape her. Even if the objective intents for these crimes were the same or similar, neither of these crimes furthers the other and they inflict distinct harms on the victim. The trial court erred in concluding that Stott's crimes encompassed the same criminal conduct. We reverse Stott's sentence and remand for resentencing.

CONCLUSION

We affirm Stott's conviction because Stott has not shown that the trial court abused its discretion when it denied his motion to dismiss for outrageous government conduct. We remand for resentencing because Stott's crimes do not encompass the same criminal conduct.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

No. 57114-5-II

CRUSER, J.

We concur:

GLASGOW, C.J.

CHE, J.

20